DOWELL, INC., Appellant,

v.

Joseph F. CICHOWSKI et al., Appellees.

No. 15489.

Court of Civil Appeals of Texas, San Antonio.

June 23, 1976.

Rehearing Denied Sept. 8, 1976.

Maddin, White & Brin, Inc., Harry F. Maddin, Corpus Christi, for appellant.

Perkins, Davis, Oden & Warburton, Alice, for appellees.

KLINGEMAN, Justice.

This is a suit for damages allegedly resulting from a squeeze tool or packing tool becoming lodged in an oil and gas well being drilled in Jim Wells County, Texas in connection with a "squeeze job" being performed on said well by defendant, Dowell, Inc.

Plaintiff, Joseph F. Cichowski, is the lessee under an oil and gas lease covering certain lands in Jim Wells County and was the operator of a well being drilled on said land, known as the Cichowski Well No. 2. The other plaintiffs are investors in such prospect, although the exact nature and extent of their interest is not shown. Dowell, Inc. is an oil field specialty company that conducted the squeeze job operations. Damages were sought by plaintiffs for remedial repairs made necessary because of defendant's alleged negligent operations and for the destruction and loss of the well. Trial was to a jury who found the well to be capable of producing oil and gas in paying quantities prior to the squeeze job, and that such capacity to produce was completely destroyed as a direct and proximate result of the squeeze operations. The jury further found that defendant was negligent in failing to raise the squeeze tool above the top level of the cement after the squeeze job was conducted; that such failure was negligence, a proximate cause of the tool sticking in the well, and a proximate cause of the destruction of the well. Based upon such jury findings, the trial court entered judgment for plaintiffs against defendant in the sum of $76,706.33.

The well here involved is located on a tract of land leased by the trustee for Harry J. Mosser, Jr. and Suzanne Mosser Shanks to Joseph F. Cichowski. A prior well, designated as Cichowski Well No. 1, was drilled on the leased premises but was plugged and abandoned in April 1972 because an allegedly uncontrollable gas sand was encountered during the drilling process. After plugging this well, the well site was moved a short distance from the first well, and drilling operations commenced on Cichowski Well No. 2. Although Cichowski was the lessee under the lease and the operator of the well, Harry J. Mosser acted as a consultant and adviser. During the drilling of the well, numerous tests were conducted to determine if such well would be a producer. There is testimony that such tests were highly favorable, and there is testimony that the well would probably be oil productive. Based upon such tests, it was decided that casing be set and the well completed.

Several attempts to complete the well were made without any particular success, although there is testimony that on some tests some oil and water were produced. It was finally determined that salt water was invading the sand which was being tested, preventing the completion of the well as a producing well in such sand. Cichowski and Mosser decided to have an operation, known in the oil field as a squeeze job, conducted. A squeeze job is an operation, usually performed by an oil field service company, wherein cement is pumped down into the well and forced outside the casing through perforations deliberately made in the casing; such cement is forced into the strata and formations surrounding the well so as to create a seal or dam between the water

and the oil-bearing sand. Mosser contacted defendant to conduct such operations. Two employees of defendant, Earl Leach and Roy Bertram, were in charge of the squeeze job operations.

After the squeeze job was completed, an attempt was made to remove the squeeze tool from its attached position inside the well, but trouble was encountered. Such process culminated in the squeeze tool being lodged or embedded in the well at the original position where the squeeze job was conducted. After it was determined that the squeeze tool was lodged and stuck in the well, there is testimony that Leach made arrangements with Parsons & King, Inc., an oil field specialty company specializing in the removal of substances that are caught or lodged in a well, to remove the tool. Parsons & King thereafter commenced operations to remove the tool, with Leach directing and in charge of the removal operations. Considerable trouble was encountered in releasing or removing the tool, with various methods being tried and with some disagreement as to the best method to be used. It appears undisputed that removal of the lodged squeeze tool was absolutely necessary in order to complete the well. After several unsuccessful attempts to remove the tool were made, it was finally decided to mill or drill the tool out by use of special milling tools. This process continued over several days, and during the process, cuttings, consisting of debris and other substances, were flushed from the well, with Mosser testifying that he observed shale in the cuttings. After the squeeze tool was ultimately removed from the well, additional attempts were made to complete the well as a producer; none of which were successful. There is testimony by Mosser and Cichowski that they believed the well in the producing sand had been polluted and ruined, and the well was finally abandoned.

We first consider defendant's point of error that the trial court erred in failing to grant defendant indemnity from plaintiff Cichowski, and/or in failing to enforce the limitation of liability provisions contained in the contract under which the work was done.

The contract or invoice relied upon by defendant was introduced into evidence as an exhibit and is dated June 14, 1972. The customer is shown as Joseph Cichowski. It lists various work and services performed by Dowell and the indemnity or limitation of liability provisions relied on by Dowell are contained on the back of the invoice.[1] On the face of the invoice there are two places for the signature of the customer. At the top of such invoice, above a line for signature by the customer, appears the following: "I have read, understood and agreed to the terms and conditions printed on the reverse side hereof and represent that I have full authority to accept same

1. The provisions relied on by Dowell are as follows:

   Unless caused by Dowell's willful misconduct or failure to exercise good faith, customer agrees to be fully responsible for and secure Dowell against:
   (i) Liability for damage to property of customer (and well owner if different than customer), this provision applying to but not limited to subsurface damage and surface damage arising from subsurface damage;
   (ii) Liability for reservoir loss or damage, or any property damage or personal injuries resulting directly or indirectly from subsurface pressure, well blowout or cratering, or losing control of the well;
   (iii) Liability for any damages whatever, resulting directly or indirectly from a subsurface trespass arising out of any servicing operation performed by Dowell for customer;

   Additional terms and conditions under which the work was performed provide as follows:
   a. If tools, equipment or instruments of Dowell are lost in a well, customer agrees to make a reasonable effort at customer's risk and expense to recover same; and, if unable to recover, to pay Dowell for same unless such loss or damage was caused solely by Dowell's negligence.
   b. Unless caused by Dowell's willful misconduct or failure to exercise good faith, Dowell shall not be liable for and customer shall secure Dowell against any liability for damage to property of customer (and well owner if different from customer) resulting directly or indirectly, from tools, equipment or instruments of Dowell being lost in a well.

and sign this order." There is no signature whatsoever on the line marked "customer."

At the bottom of the page there is another line for signature by the customer, and above such signature line the following appears: "RECEIPT: The undersigned hereby certifies that the materials and equipment listed above were received and the services were performed in a workmanlike manner." The line marked "customer" is signed by Harry J. Mosser.

Leach, one of Dowell's employees who was in charge of the squeeze job operations, testified that a work order receipt is usually written up before you leave the job and it is a verification that the work is being done. He stated that he did not discuss any terms or provisions with Mosser. He stated that the June 14th receipt is signed at the bottom part, not at the top, and that Mosser did not need to sign at the top because the job was completed when he signed it, but that usually customers signed at both the top and the bottom after the job was completed. There is evidence that at no time were any terms or conditions regarding indemnity and limitation of liability brought to the attention of Mosser by either Leach or Bertram. Mosser testified that the invoice was brought to him by Leach during the squeeze job; he signed it at the bottom; no special terms or conditions were explained to him; and, he did not orally agree to any of such terms.

Defendant introduced into evidence similar invoices dating back to 1971, not pertaining to the job here involved, which either Cichowski or Mosser had signed. It asserts that since both had previous dealings with Dowell, they were familiar with the terms and provisions of these types of invoices. If such invoices on previous jobs are of any materiality whatsoever, at best they are somewhat of a two-edged sword, and it can be argued persuasively that Mosser deliberately chose not to sign the line which agrees and refers to the terms and provisions on the reverse side.

Plaintiff asserts that as a matter of law it did not enter into an indemnity limitation of liability contract with defendant or any agreement whereby defendant would be exonerated from the consequences of its own negligence; and that, from the examination of the document itself relied on by defendant, it is apparent from the face of the instrument that plaintiff did not agree to be bound by the terms and conditions which were contained on the back of the invoice. They further urge that if this is not correct as a matter of law, there would at least be a fact question as to the intention of the parties which would have to be determined by the trier of the facts, and that defendant waived and abandoned this ground or theory of recovery by failing to request that his submission of any issue regarding such alleged contract.

Indemnity contracts have been the subject of many lawsuits, and there are a number of pertinent Supreme Court decisions. In *Spence & Howe Construction Company v. Gulf Oil Corporation*, 365 S.W.2d 631 (Tex.1963), the Court stated:

> Ordinarily, however, one does not contract against the results of his own negligence. Such agreements, except for insurance contracts, must be regarded as exceptional rather than usual in the majority of business transactions. Before such indemnity contracts may be enforced it must clearly appear that the contracting parties intended that the indemnitor would be held liable for damages resulting from the negligence of the indemnitee.

In *Joe Adams & Son v. McCann Construction Company*, 475 S.W.2d 721 (Tex. 1971), the Supreme Court said:

> Texas follows the general rule that an indemnity agreement will not protect the indemnitee against the consequences of his own negligence unless the obligation is expressed in unequivocal terms. It is not necessary for the parties to say, in so many words, that they intend to save the indemnitee harmless from liability for his own wrongs, but it is necessary for that intention to clearly appear when all the provisions of the contract are considered in the light of the circumstances surrounding its execution.

We have concluded that under the record and the applicable authorities, plaintiff did not enter into any indemnity or limitation of liability contract or agreement whereby defendant would be exonerated from the consequence of its own negligence. Defendant's Point of Error No. 1 is overruled.   ·

By six points of error defendant complains of the legal and factual insufficiency of the evidence to support certain special issues.

Defendant's second and third points of error complain that (a) there is no evidence to support the jury's answer to Special Issue No. 3A; (b) there is insufficient evidence to support such answer and such answer is contrary to the overwhelming weight and preponderance of the evidence. Special Issue No. 3A was predicated upon affirmative answers to Special Issue No. 1, in which the jury found that on the occurrence in question, Dowell failed to raise the squeeze tool above the top level of the cement after the squeeze job was conducted; and Special Issue No. 2, in which the jury found that such failure was negligence. Defendant makes no complaint on this appeal as to the jury's answers to these two special issues. In Special Issue No. 3A, the jury found that such failure was a proximate cause of the destruction of the well. Defendant's second and third points of error are directed to this finding.

By its fourth and fifth points of error defendant complains that (a) there is no evidence to support the jury's answer to Special Issue No. 1A; (b) there is insufficient evidence to support the jury's answer to such special issue and the jury's answer is against the great weight and preponderance of the evidence.

Defendant's sixth and seventh points of error complain that (a) there is no evidence to support the jury's answer to Special Issue No. 1B of the court's charge; (b) there is insufficient evidence to support such jury's answer and such answer is against the great weight and preponderance of the evidence.

In answer to Special Issue No. 1A the jury found that the Cichowski Well No. 2 had the capacity to produce oil and/or gas in paying quantities prior to the squeeze job in question, and in answer to Special Issue No. 1B the jury found that such well had its capacity to produce oil and/or gas in paying quantities completely destroyed as a direct and proximate result of the squeeze operation conducted by Dowell.

A "no evidence" point of error is a question of law, and in considering this question it is the duty of the court to view the evidence in its most favorable light, considering only the evidence and reasonable inferences drawn therefrom in support of a fact issue or a fact finding and disregarding all evidence and inferences to the contrary. *Transport Insurance Company v. Mabra*, 487 S.W.2d 704 (Tex.1972); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). On the other hand, an assertion that the evidence is "insufficient" to support a finding of fact can mean that the evidence is factually insufficient, that is, the evidence supporting the finding is so weak, or the evidence to the contrary so overwhelming that the finding should be set aside and a new trial ordered. The intermediate court is required to consider all the evidence in deciding this question. *Garza v. Alviar*, supra; *Gulf, Colorado & Santa Fe Railway Company v. Deen*, 158 Tex. 466, 312 S.W.2d 933 (1958). See also Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960).

Defendant's basic complaint in support of such points of error is (a) the well did not produce oil or gas either before the squeeze job or after the squeeze job; (b) after the squeeze job was completed and the tool recovered, the well did exactly what it had done before—produce water. Moreover, they argue that if the well ever was capable of producing oil or gas, there is insufficient evidence to support the jury's finding that such capacity to produce was completely destroyed as a direct and proximate result of the destruction of the well.

The testimony shows that during the drilling stage of the Cichowski Well No. 2,

numerous tests were conducted to determine if such well could be oil or gas productive. Such tests included an electro-log test, neutron-log tests, mud log tests, core analysis, and formation tests. There is testimony that these types of tests are used and relied upon in the gas and oil business in determining whether or not a well is oil or gas productive. There is testimony that the tests taken in the well were highly favorable in that (a) the cuttings from the mud log tests had excellent color and indicated the presence of oil; (b) the core analysis was very favorable; (c) the formation tests were considered excellent. Milton Craft, an expert and specialist in the field of core analysis, testified that he had been involved in the interpretation and supervision of analyses of about 600 wells a year in south Texas, that he personally did core analyses on the well here involved and analyzed three sand samples at 4160, 4162, and 4164 feet for permeability, porosity, and fluid saturation, and that such tests indicated sufficient permeability for fluid flow, normal porosity, and normal residual oil saturation. He further testified as to the measurement of water in the cores, and stated that in his opinion there would be a high probability that the zone would produce oil.

Mosser testified that as a result of his interpretations of the various tests and his knowledge and familiarity with the sands and formations in the immediate area of the well, he had no doubt that the well would be completed as an oil producer in the zone that was ultimately perforated. Sawyer, a geologist, testified by written interrogatory that the well in question had oil shows at 4160 feet, gas shows at 4530 feet, and gas shows at 4880 feet by core analysis. Mosser testified in some detail that he witnessed the various tests and observed the cuttings as they were brought out of the well; they took side wall cores from approximately 4160 to 4168 feet; the sand started at about 4158 feet and was believed to be about 8 feet thick; and, the sand had good color, which meant oil. There is testimony that there is a producing well to the east, west, and south of the

Cichowski Well No. 2, and a number of producing wells to the north, with the best producing zone or formation being approximately 4160 feet, the same zone which was ultimately perforated in the Cichowski Well No. 2.

On the basis of such tests, casing was set and attempts were made to complete such well. Although numerous attempts to complete the well were thereafter made, none were successful. Oil and water were found in the initial tests. However, operations to complete the well as a flowing well were unsuccessful. It was finally decided to perform a squeeze job. There is testimony that squeeze jobs are conducted whenever the well has been perforated and it is either not producing a sufficient amount of oil and gas, or there is production of oil and water. Cement is pumped through holes that have been shot in the casing, out into the formation, thereby blocking off the water flowing into the casing. It is an attempt to seal off the water in the oil sand, or close off all perforations that have been made to obtain production in different sands.

We have heretofore set forth in some detail the testimony pertaining to the alleged negligence of defendant in connection with the squeeze job operation. Since defendant makes no complaint on this appeal as to the jury's answers to Special Issues No. 1 and 2, pertaining to such negligence, we will not attempt any further discussion of such matters at this time.

After the squeeze tool was ultimately recovered from the wall, additional attempts were made to complete the well as a producer, but all were unsuccessful. Mosser testified that before the squeeze job oil and water were coming from the well, but that after the squeeze job there was never any oil show from the well. Mosser also testified that in his opinion, the inability of the well to produce was not a problem with the sand, but was a mechanical problem; he believed that the trouble arose basically from the grinding and milling process in connection with the removal of the tool, such work and shooting ruined the sand; and, either a hole was cut in the casing as

they tried to get the tool out, or the cement itself sealed off the oil sand.

██ It is evident from the testimony that in drilling a test well for oil and gas it is difficult to determine whether such well will be productive or not. This is perhaps true because the producing formations are normally many thousands of feet under the surface of the well. Over the years the oil and gas industry has developed numerous tests in order to determine whether an oil and gas well has possibilities of production, including electro-log tests, neutron tests, mud log tests, and core analysis. Based upon such tests and the advice of experts in such fields, a determination is made as to whether there is any possible productive formations or sand, and if so, where to perforate and ultimately, where to attempt to complete the well. There is evidence that it is not abnormal for water to be produced along with oil, and in many instances water will cause no problem; but, excess water or particularly salt water, will cause problems and will sometimes prevent the well from flowing. When such water problems are encountered squeeze jobs are regularly used with considerable success.

It is seen from the above testimony that the Cichowski Well No. 2 was drilled at a location where there was production in the immediate area to the east, west, south, and north; during the process of drilling such well various recognized and accepted tests used in the oil industry to determine if a well would be productive were conducted; such tests were highly favorable; on the basis of such tests casing was set and attempts made to complete the well; although some of the initial tests produced some oil and water, the operators were unable to complete the well as an oil producer;

it was decided to do a squeeze job, and defendant was employed to conduct such squeeze job; during such operation a squeeze tool became lodged or stuck in the well; it was impossible to complete the well without removing the squeeze tool; difficulties were encountered in removing the squeeze tool, culminating in ultimate removal by milling or drilling it out. There is testimony that defendant was negligent in its squeeze job operations and that such negligence was a proximate cause of the loss and destruction of the well.

We have concluded that the jury's answers to Special Issues No. 1A, 1B, and 3A are sufficiently supported by the evidence. Defendant's Points of Error Nos. 2, 3, 4, 5, 6, and 7 are overruled.

Five of defendant's points of error pertain to the matter of damages. Defendant's eighth and ninth points of error complain that (a) there is no evidence to support the jury's answer to Special Issue No. 13; (b) there is insufficient evidence to support the jury's answer to such issue, and such answer is so contrary to the overwhelming weight and preponderance of the evidence.[2]

Defendant's 10th and 11th points of error complain that (a) there is no evidence to support the jury's answer to Special Issue No. 12A; (b) there is insufficient evidence to support the jury's answer to such special issue, and the jury's answer is against the great weight and preponderance of the evidence.[3]

██ Defendant's 12th point of error complains that the trial court erred in admitting into evidence Plaintiffs' Exhibit No. 1, and alternatively, erred in admitting into evidence those portions of Plaintiffs' Exhib-

2. In Special Issue No. 13 the jury found that the reasonable cost of drilling and completing an oil and gas well of the same dimensions, type, and depth of Cichowski's Well No. 2 in Jim Wells County on the date of the occurrence in question was $66,000.00. In Special Issue No. 14 the jury found that the reasonable salvage value of Cichowski's Well No. 2 in Jim Wells County after the occurrence in question was $3,000.00. Defendant makes no attack on the jury's finding as to Special Issue No. 14.

3. In Special Issue No. 12A the jury found that the market value of the well involved immediately before the occurrence in question was $66,000.00, and in Special Issue No. 12B the jury found that the market value immediately after the occurrence in question was $3,000.00. Defendant does not complain of the jury's answer to 12B.

it No. 1 which clearly and admittedly were not related to the cost of drilling and completing the well in question.

Special Issues No. 13 and 12A were submitted in accordance with the rules set forth in *Shasta Oil Company v. Halliburton Oil Well Cementing Company*, 10 S.W.2d 597 (Tex.Civ.App.—Amarillo 1928, writ ref'd) and *American Glycerin Company v. Kenridge Oil Company*, 295 S.W.2d 633 (Tex.Civ.App.—Eastland 1927, no writ). In *Shasta*, the Court held that the proper measure of damages arising out of the negligent cementing of an oil and gas well was the cost of drilling another such well, less the net value of the salvage that could be secured from the well that had been drilled. We regard this as a correct measure of damages. In *American Glycerin*, the measure of damages applied by the trial court for a well damaged by a premature explosion, was the fair reasonable cash market value of an oil and gas well immediately prior to an explosion. The Appellate Court said:

> We suggest that upon another trial of this case evidence should be admitted and the jury called upon to determine in answer to a proper special issue whether or not the well could be reproduced by drilling another one. If so, the correct measure of damages would be the cost of reproducing and equipping same in the manner that this well was equipped, less the value of any salvage realized by appellees, provided the cost did not exceed the value of the well. Should the cost of reproduction as found by the jury exceed the value of the well, as found by them, or should the jury determine upon competent testimony that the well could not have been reproduced, the damages should be assessed at the reasonable, cash market value of the well as equipped immediately preceding its destruction, less the value of any salvage realized by appellees.

It should be noted that the jury in the case before us determined that the market value of the well was the same as the cost of drilling and completing an identical well ($66,000.00).

Defendant's no evidence and insufficient evidence points of error in this connection are primarily based on two contentions: (a) that the jury answers were based at least in part on the material contained in Plaintiffs' Exhibit No. 1, which defendant complains was erroneously admitted into evidence; (b) the only evidence, if any, over and above the material contained in Plaintiffs' Exhibit No. 1 was that of Harry J. Mosser, which evidence is not credible.

Plaintiffs' Exhibit No. 1 is a mass of statements relating to the cost and drilling of the Cichowski Well No. 2. While many of such statements pertain to the cost of drilling and completing such well, some admittedly do not.

There is other pertinent testimony in this regard, however. Harry J. Mosser testified that he had been in the oil business since 1923, including extensive experience in the area here involved, and that in 1972 it would have cost between $80,000.00 and $120,000.00 to drill and complete a similar well. He further testified that a reservoir study had been made of the area where the well was drilled; he was familiar with the study; based on his familiarity with the study and his own personal experience, he would not have taken less than a quarter of a million dollars for the well and the 40 acres surrounding the well; and, in determining this figure, he considered that a well, like this one, without any damages, should bring in that amount, considering the structural data and his own experience.

There is testimony from both Mosser and Cichowski as to the various bills attached to Plaintiffs' Exhibit No. 1 with regard to the cost of drilling the Cichowski Well No. 2. It is clear that some of the bills have no relation to such well, while other of the statements are in connection with such well, and there is testimony as to the reasonableness of such charges. We think that the court was in error in admitting many of these items contained in Plaintiffs' Exhibit No. 1. However, even if we disregard Plaintiffs' Exhibit No. 1 in its entirety,

there is sufficient other evidence to support the jury's answers to Special Issues No. 13 and 12A, and any error in admitting Plaintiffs' Exhibit No. 1 or parts thereof is harmless error. Rule 434, Tex.R.Civ.P.

Defendant's Points of Error Nos. 8, 9, 10, 11, and 12 are overruled.

Defendant's Point of Error No. 13 complains that the trial court erred in failing to grant defendant judgment for services performed by it for plaintiff, or alternatively, to grant defendant offset against any judgment taken against it by plaintiff.

The only special issue submitted to the jury pertaining to services performed by Dowell is Special Issue No. 15, in which the jury found that the services performed by Dowell on the occasion in question had no value to Cichowski. Defendant makes no complaint on this appeal of the form of submission of such special issue, or that the court erred in failing to submit any special issue requested by it.

In support of such point of error, defendant's only contention in his brief is (a) there is testimony that Dowell's bills were reasonable and necessary; (b) there is testimony by one of Dowell's employees that Cichowski owed Dowell $5,143.81; (c) under such testimony, Dowell was entitled to judgment or offset.

■ However, there is testimony that Dowell's services were of no value to plaintiff. There is testimony that it was absolutely necessary to remove the lodged tool to complete the well and that it was impossible to bring in the well without getting out the lodged tool. There is also testimony that when a specialty company is conducting an operation such as a squeeze job, the service engineer with the company directs and is in charge of the control of the work, and that this was done during the operation. There is testimony that the sticking or lodging of the tool and the subsequent damage to the well in attempting to remove the tool, was due to defendant's negligence. Cichowski testified that he felt that Dowell did not do the job in a workmanlike manner, and for that reason they did not owe Dowell for the work they did. Mosser testi-

fied that the whole trouble was basically caused by the sticking of the tool, and that in his opinion, the sticking of the tool and the damages caused to the well were due to improper and negligent work by Dowell. Cichowski further testified that the reason Dowell had not been paid was that it did not do the job that it had contracted to do, and that such work in fact damaged the well.

*Shasta Oil Company v. Halliburton Oil Well Cementing Company,* supra, was a suit by Shasta against Halliburton for damages allegedly arising out of Halliburton's failure to properly cement the well. Halliburton filed a cross action asserting that at the request of Shasta it did cement work on the well at an agreed consideration of $550.00, which was the usual and customary cost, and that by reason thereof, Shasta owed it $550.00. Shasta contended that the work was worthless and without value. The Court stated that there was evidence to support such contention and cited several cases holding that if one represents himself as a workman, he impliedly covenants that he will perform the work skillfully; and, in an action for work and labor, it is a good defense that the work was done so badly as to be of no value or benefit to the person for whom it is done. In *Moody v. Messer,* 489 S.W.2d 319 (Tex.Civ.App.—Corpus Christi 1972, no writ), the Court stated:

In the absence of an express agreement in the contract to the contrary, accompanying every contract is a common-law duty to perform the work agreed to be done with care, skill, reasonable expedience and in a good and workmanlike manner; and, if the work is not performed in such manner and the work proves to be worthless, then the person performing the same will not be permitted a recovery therefor.

Clearly, a fact issue exists as to whether the services performed by Dowell had any value to Cichowski, and under the record there is sufficient evidence to support both the submission of Special Issue No. 15 and the jury's answer thereto. Defendant's Point of Error No. 13 is overruled.

By its last point of error defendant asserts that the trial court erred in entering judgment for one of the plaintiffs, Sawyer, who had judicially disclaimed any interest in the subject matter of the lawsuit, and in entering judgment for plaintiffs collectively without evidence of their particular interest in the proceedings and without apportionment of their damages.

Defendant's basic complaint on this point of error is that no attempt was ever made to prove the nature and extent of the interest which the various plaintiffs had in the subject matter of the lawsuit; there was no evidence as to the proportion or interest the various plaintiffs had in the losses allegedly sustained; and, the judgment makes no attempt to segregate or apportion damages among the various plaintiffs.

The judgment decrees that plaintiffs recover the sum of $76,706.33 from defendant. Plaintiffs in this cause are Joseph F. Cichowski, John Petty, Roy Conroy, Arthur F. Albert, Jr., W. D. Bronson, L. H. Wharburton, Jr., Halbert Sawyer, John Suter, and Helen Boyce. It is to be remembered that the jury, in answer to special issues submitted, found that (a) the reasonable cost of remedial repairs necessary to remove the squeeze tool is $13,706.33; (b) the reasonable cost of drilling and completing an oil and gas well of the same dimensions, type, and depth of the Cichowski Well No. 2 is $66,000.00; (c) the reasonable salvage value of the well after the occurrence in question is $3,000.00; (d) the market value of Cichowski Well No. 2 immediately before the occurrence in question was $66,000.00, and immediately thereafter, $3,000.00. It is obvious the award of $76,706.33 is based on a sum of $66,000.00 less the sum of $3,000.00, or $63,000.00 plus the sum of $13,706.33, which aggregates a total of $76,706.33.

Rule 301, Tex.R.Civ.P., provides in part as follows:

Judgment may, in a proper case, be given for or against one or more of several plaintiffs, and for or against one or more of several defendants or intervenors.

In *Texas & N. O. Ry. Co. v. Stevens*, 24 S.W.2d 9 (Tex.Comm.App.1930, jdgmt. adopted), the railroad company contended that the Court of Civil Appeals erred in affirming the judgment for the reason that there were three parties plaintiff interested in the judgment and there is no provision in the law for an apportionment of an award among the several plaintiffs, other than by jury. The Court said:

In our opinion, this assignment is untenable. In the first place, the railway company is not interested in the matter of apportionment at all, and, even if the case ought to be sent back to have a jury apportion the judgment as finally affirmed by the Court of Civil Appeals, the only parties that could be concerned therein would be the three plaintiffs.

In *Chandler v. Stewart*, 90 S.W.2d 590 (Tex.Civ.App.—Texarkana 1936, writ dism'd), the plaintiffs in error complained that the judgment of the trial court was not responsive to the pleadings and therefore void, because the suit was by Curnegan and Stewart, each claiming an undivided one-half interest in the mineral estate in the land in question, whereas the judgment awarded Stewart alone the title to the entire estate in the whole tract of land. The Court said:

In our opinion, this judgment is not void, but, at most, is irregular, and as to Stewart is excessive. As regards the plaintiffs in error, we can see no reason for their complaint in this regard. The judgment effectively divested out of them the title to the whole of this tract of land, and it does not concern them which of the defendants in error gets the title, whether Stewart alone or Stewart and Curnegan in equal parts.

We fail to see how defendant is in any way hurt or damaged by the failure of the trial court to set forth exactly what interest each plaintiff has in the judgment awarded, or the failure to make an apportionment between the respective plaintiffs. This is a matter that is purely the plaintiffs' concern.

Defendant also complains that the trial court erred in entering judgment for one of the plaintiffs, Sawyer, who they assert had

judicially disclaimed any interest in the subject matter of the suit. Such alleged judicial disclaimers are based upon certain written interrogatories. In one such interrogatory, Sawyer was asked whether or not he had any interest in the well made the subject matter of the suit. Sawyer answered, "No assigned interest to my knowledge." In two of the questions, he was asked to set forth each and every sand which he or any plaintiff claimed to have been damaged as a result of the Dowell squeeze job, and also, to set forth certain geological information in connection with his answers. In answer, Sawyer stated, "I have made no claim whatsoever." Assuming, without deciding, that this is such a judicial disclaimer as to preclude Sawyer from any recovery, *United States Fidelity & Guaranty Company v. Carr*, 242 S.W.2d 224 (Tex.Civ.App.—San Antonio 1951, writ ref'd), we fail to see how defendant was in any way harmed. If plaintiffs see fit to give Sawyer a portion of the judgment awarded them collectively, this is a matter for them to determine, and defendant is in no way injured. If any error is shown, it is harmless error. Rule 434, Tex.R.Civ.P.

All of defendant's points of error have been considered and all are overruled. The judgment is affirmed.