736 S.W.2d 914 (1987)
ATEX PIPE & SUPPLY, INC., et al., Appellants,
v.
SESCO PRODUCTION CO., Appellee.
No. 12-85-0024-CV.
Court of Appeals of Texas, Tyler.
August 31, 1987.
Rehearing Denied October 12, 1987.
*915 Charles H. Clark, Tyler, Rex A. Nichols, Nichols, Merriman, Patterson & Allison, John M. Smith, Roberts, Harbour Law Firm, Longview, for appellants.
Ron Adkison, Henderson, Eugene W. Brees, Thompson & Knight, Dallas, for appellee.
Before SUMMERS, C.J., BILL BASS, J and STEPHEN F. PRESLAR, C.J. (Retired) 8th Court of Appeals, sitting for PAUL S. COLLEY, J.
SUMMERS, Chief Justice.
Our opinion of October 27, 1986, is withdrawn and the following opinion is substituted.
This is a products liability and breach of warranty case. On April 28, 1982, appellee[1] Sesco Production Company (Sesco) filed suit against appellant Atex Pipe & Supply, Inc. (Atex), alleging that Atex had sold Sesco defective tubing. Sesco asserted that this defective tubing collapsed in the Sesco-Bill Wilkerson No. 1 gas well (Wilkerson 1), causing damage to both the well and the gas-producing geological formation. Atex denied Sesco's allegations and, on January 7, 1983, filed a third party action for contribution and indemnity against nine pipe suppliers and manufacturers.[2] On September 14, 1983, third party defendant Crescent Pipe & Supply (Crescent) filed an action for contribution and indemnity against Mustang Production Company (Mustang), and on November 10, 1983, Atex filed a cross-action against Mustang for contribution and indemnity. The jury found that a joint of pipe collapsed in Wilkerson 1, that the joint of pipe was sold by Atex to Sesco, that the pipe was not merchantable, that the non-merchantable pipe was a proximate cause of the occurrence and resulting damages, that the pipe was defective, that the pipe reached Sesco without substantial changes in its condition from the time it was originally sold, that the defective pipe was the producing cause of the occurrence in question and the resulting damages, and that Sesco had suffered $1,880,000 in damages. Based on the jury's verdict and the stipulations of the parties, the trial court entered judgment that Sesco recover from Atex $1,880,000; that Atex recover from Crescent and Mustang, jointly and severally, $1,880,000; that Crescent recover from Mustang $1,880,000; that the judgment bear interest at the maximum rate allowed by law; and that the costs are adjudged against Atex, with right of indemnity against Crescent and Mustang, jointly and severally, with Crescent receiving indemnity from Mustang. We reverse and remand.
*916 In May of 1981, United Oilfield Rental, Inc. (United)[3] ordered 18,706.6 feet (607 joints) of "27/8th inch OD 8 round EUE N-80 6.50 api Prime seamless monogrammed Lone Star tubing, T & C R-2"[4] from Atex. Because Atex did not have sufficient tubing in stock, it ordered 607 joints of this tubing from Crescent. Crescent, which had insufficient stock to fill Atex's order, in turn ordered the 607 joints of tubing from Mustang. Mustang sold the tubing to Crescent; however, Crescent never took physical possession. Rather, the tubing remained in Mustang's possession at the storage yard of Turner Brothers Trucking Company in Oklahoma City until Crescent consigned the tubing, "F.O.B. Turner Bros. Yard Okla City, OK," to Atex. On May 8, 1981, at Atex's instruction, the tubing was transported to Kilgore Pipe & Supply (Kilgore Pipe) in Kilgore, where it was stored on Rack No. 3 for United. On August 24, 1981, 389 of the joints stored on Rack No. 3 were shipped to Wilkerson 1.
Wilkerson 1 was a Cotton Valley gas well, over 10,000 feet deep. The well was perforated and began production on September 1, 1981. Wilkerson 1 had an open flow capacity of 1,299,000 mcf per day, and initial production was very high. The well production, however, sharply decreased over the next month, and on September 30, 1981, Halliburton Services performed an acidizing job on Wilkerson 1 in an effort to increase production. On the same day, Marvin A. Smith Co., performed a swabbing job to lift the spent acid and acid water out of Wilkerson 1. On October 1, 1981, and October 6, 1981, a nitrogen job was performed on the well to aerate the fluids, improving the flow of the well. On October 14, 1981, Turner Consulting[5] pulled the tubing out of Wilkerson 1, and some of Turner's employees, none of whom testified at trial, observed a totally collapsed joint of tubing.[6] George Turner, President of Turner Consulting and Sesco's expert witness, testified that, as a result of the collapsed tubing, "spent acid [was] ... left on the formation ... causing swelling of [the] clays. . . .," effectively plugging the well. Turner pointed out that as a result, between 820 and 2347 million cubic feet of gas were lost. He testified that the value of those lost reserves, at the time of trial, was between $1.00 and $1.25 per thousand cubic feet.[7]
Several witnesses testified that the tubing was defective because it collapsed under less pressure[8] than its listed collapse resistance of 11,000 pounds per square inch. However, Dennis Stanfield, a metallurgist, testified that the tubing was welded and had no significant defects. Both *917 Bruce Dedman, a metallurgist and vice president of Lone Star Steel, and Samuel Bryan, Jr., also a metallurgist, testified that the tubing was welded and met all of the industrial requirements for this type of tubing. Furthermore, both Stanfield and Bryan testified that the tubing could have collapsed if it had been mishandled, and as a result, was out of round.
Atex brings twenty-six points of error; Crescent urges four points and Mustang nine.
Atex's twenty-fifth point of error contends that "the court erred in rendering judgment based on the jury's answer to Special Issue No. 8, because Special Issue No. 8 submits an improper measure of damage." Mustang's first point of error makes a similar challenge to this special issue. We shall discuss these points together. Special Issue No. 8 reads as follows:
Find from a preponderance of the evidence the sum of money, if any, that should be awarded to Plaintiff Sesco Production Company for its damages herein.
You are instructed in regard to this Special Issue that you may consider the following elements of damage and none other:
(A) Loss of production in the past;
(B) Loss of production in the future;
(Answer in Dollars and Cents, if any)
ANSWER: $1,880,000.00.
Sesco's interest in Wilkerson 1 is an interest in real property. Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558, 561 (1948); Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 476-77 (1942); Whitson Co. v. Bluff Creek Oil Co., 278 S.W.2d 339, 346 (Tex.Civ.App.Fort Worth 1955), aff'd, 156 Tex. 139, 293 S.W.2d 488 (1956). Therefore, if the well can be reproduced by drilling another one, the proper measure of damages is the cost of drilling and equipping another such well, less the value of any salvage; provided that this cost does not exceed the reasonable cash market value of the well immediately before the tubing collapse. If the well cannot be reproduced or if the cost of reproduction exceeds the value of the well, the proper measure of damages is the difference in the reasonable cash market value of the well, as equipped, immediately before and immediately after the tubing collapse. Dowell v. Chichowski, 540 S.W.2d 342, 350 (Tex.Civ. App.San Antonio 1976, no writ); Whitson Co., 278 S.W.2d at 346; Shasta Oil Co. v. Halliburton Oil Well Cementing Co., 10 S.W.2d 597, 599 (Tex.Civ.App.Amarillo 1928, writ ref'd); United States Torpedo Co. v. Liner, 300 S.W. 641, 647 (Tex.Civ. App.Eastland 1927), aff'd, 16 S.W.2d 519 (Tex.Comm'n App.1929, judgmt adopted); see Porras v. Craig, 675 S.W.2d 503, 504 (Tex.1984); Bayouth v. Lion Oil Co., 671 S.W.2d 867, 868 (Tex.1984); Kraft v. Langford, 565 S.W.2d 223, 227 (Tex.1978); Trinity & S. Ry. Co. v. Schofield, 72 Tex. 496, 10 S.W. 575, 577 (1889); The Texas & Pacific Ry. Co. v. Levi & Bro., 59 Tex. 674, 679 (1883); Ansley v. Tarrant County Water Control and Improvement District No. One, 498 S.W.2d 469, 474 (Tex.Civ.App. Tyler 1973, writ ref'd n.r.e.).
While the form for submission of a particular special issue is left to the sound discretion of the trial court according to the requirements of each party, the submission must be sufficient to enable the jury to make an award of damages on proper grounds and correct principles of law. Sawyer v. Fitts, 630 S.W.2d 872, 875 (Tex.App.Fort Worth 1982, no writ); Mangham v. Hall, 564 S.W.2d 465, 468 (Tex.Civ.App.Corpus Christi 1978, writ ref'd n.r.e.). A submission is fatally defective if it fails to guide the jury to a finding on any proper legal measure of damages. Jackson v. Fountaine's Clinics, Inc., 499 S.W.2d 87, 90 (Tex.1973). We conclude that Special Issue No. 8 was fatally defective.
Sesco advances three arguments why this court should not reverse this judgment because of the submission of Special Issue No. 8. First, Sesco contends the *918 measure of damages depends upon the nature of the injury, citing Kraft, 565 S.W.2d at 227; Atlas Chemical v. Anderson, 524 S.W.2d 681 (Tex.1975), and B.A. Mortgage Company, Inc. v. McCullough, 590 S.W.2d 955, 957 (Tex.Civ.App.Fort Worth 1979, no writ).[9] Sesco contends that since it is a production company, the appropriate measure of damages is loss of production. The nature of the injury, not the nature of the injured party's business, is the pertinent inquiry. Sesco cites no case in support of this measure of damages. The application of the measure of damages set forth in Dowell, Whitson, and Shasta will not result in an unfair or unjust result; therefore, the exception to the general rule stated in B.A. Mortgage Company is not applicable.
Next, Sesco contends that Atex waived this point of error by failing to specifically point out the defect in Special Issue No. 8. Tex.R.Civ.P. 274. We conclude that the objection[10] is sufficient to meet the requirement of Tex.R.Civ.P. 274.
Finally, Sesco contends that Atex waived this point of error by failing to request an explanatory instruction on the issue of damages. We disagree. The general rule is that objections are used when the form of a submitted special issue, definition, or explanation is affirmatively erroneous, or when a controlling issue in the opponent's theory of recovery or defense is omitted. Written requests are required to direct attention to omissions of controlling issues in a ground of recovery or defense relied upon by the requesting party, or to secure the addition of definitions or explanatory instructions. 3 R. McDonald, Texas Civil Practice in District and County Courts § 12.26 (rev. 1983). Since Atex is complaining of the trial court's submission of an affirmatively erroneous special issue and instruction, an objection was sufficient to preserve the error.[11]See Jackson, 499 S.W.2d at 90. Atex's twenty-fifth point of error and Mustang's first point of error are sustained.
In light of the disposition of these points of error, we do not reach Atex's, Crescent's, and Mustang's remaining points of error.
Sesco's motion for imposition of penalty for frivolous appeal is denied.
*919 The judgment of the trial court is reversed, and the cause remanded for a new trial.
NOTES
[1] The action was initiated by Sesco's Trustee in Bankruptcy.
[2] Alamo Pipe & Supply, Antler Pipe & Supply, Wharton Pipe & Supply, Mangum Supply, Crescent Pipe & Supply, Nippon Steel U.S.A., Kawasaki Steel America, Babcock & Wilcox Company, and Lone Star Steel. On February 11, 1983, Atex added Kilgore Pipe & Supply as a third party defendant. Subsequently, all the third party defendants except Crescent Pipe & Supply were dismissed from the suit by summary judgment or motion for nonsuit.
[3] United had been formed solely to acquire adequate oilfield pipe, tubing, and casing for Sesco. Fifty percent of United was owned by Sid Scarborough, the sole owner of Sesco.
[4] According to Bruce Dedman, a vice president of Lone Star Steel, Lone Star Steel does not manufacture seamless pipe.
[5] Turner Consulting is now operating Sesco's properties under the direction of Sesco's Trustee in Bankruptcy.
[6] The evidence is conflicting as to when the pipe collapsed. Sid Scarborough testified in his second deposition that the pipe collapsed during the acidizing job on September 30, 1981, and that he had pulled the tubing that day and discovered the collapsed joint. Tommy Bailey, technical advisor with Halliburton, testified that the well was a producing well after the acidizing job, which would be impossible if the tubing was collapsed, and that he did not learn of the collapse until two or three days after the acidizing job. Kerry Hill, who performed the swabbing job for Marvin A. Smith, Co., testified that he had no problem performing his job, that he could not have performed his job if the tubing was collapsed, and that Wilkerson 1 was a producing well the day after the swabbing. George Turner, President of Turner Consulting, testified that while the tubing could have possibly collapsed during the latter stages of swabbing, he had no opinion whether the tubing was collapsed, on October 6, 1981, the date of the second nitrogen job. Finally, Kenneth Jordan, owner of Jordan Kenco, testified that his company had pulled the collapsed tubing, but his deposition did not indicate when that occurred.
[7] Turner provided the only testimony as to damages at trial.
[8] It is uncontroverted that the maximum downhole pressure in Wilkerson 1 was 6600 pounds per square inch.
[9] Sesco also cited Signal Oil & Gas v. Universal Oil Products, 572 S.W.2d 320 (Tex.1978), for the proposition that "where collateral property damage exists in addition to damage to the unreasonably dangerous product itself recovery for such damage may be had under strict liability as damaged property or under the Business and Commerce Code as consequential damage for breach of implied warranty." This case, however, is not relevant to our consideration.
[10] Atex's objection reads, in pertinent part, as follows:

MR. CLARK: Defendant, Atex Pipe and Supply, objects to the Court's Charge specifically to Issue Number 8, which is the damage issue, for the following reasons:
One, Special Issue Number 8 as framed does not correctly submit the correct measure of damage in this case. The Plaintiff's theory of the case is that the well has suffered a permanent damage and that damage to an oil and gas well is the same as damage to realty and the proof required would be the difference in market value of the well before the occurrence in question and after the occurrence in question.
[11] The cases cited by Sesco in support of its position are not analogous to this case. In Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 538 (Tex.1981), the trial court submitted the following issue:

What sum of money, if any, if paid now in cash do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiffs for their actual damages, if any? Answer in dollars and cents, if any. ANSWER: $3,419.30. This special issue was submitted with neither a separate explanatory instruction nor an explanatory instruction incorporated in the special issue. Although the court failed to set forth the complained of special issue, the special issue in Texas Power & Light Co. v. Barnhill, 639 S.W.2d 331, 334-35 (Tex.App.Texarkana 1982, writ ref'd n.r.e.), also appears to have been submitted with neither a separate explanatory instruction nor an explanatory instruction included in the issue. Therefore the defendant must have requested a substantially correct instruction to complain of its omission. In the instant case, the court included an instruction erroneously delineating the elements of damage that the jury could consider. Therefore, only an objection could preserve this point for review. Since the trial court submitted an erroneous theory of damages, we need not address Sesco's argument on deemed findings.