NUMBER
13-00-104-CV

                                 COURT OF
APPEALS

                     THIRTEENTH DISTRICT OF
TEXAS

                         CORPUS CHRISTI B EDINBURG

 

EXXON CORPORATION,
ET AL.,                                                  Appellants,

                                                             v.

LAURIE T. MIESCH, ET AL.,                                                           Appellees.

 

 

                    On appeal from the 135th District
Court

                                        of
Refugio County, Texas.

 

 

 

                                               
O P I N I O N

 

     Before Chief Justice
Valdez and Justices Hinojosa and Castillo

 

      Opinion by Chief
Justice Valdez

 

 








This appeal follows a jury trial in an oil and gas
case.  Emerald Oil & Gas, L.C. (AEmerald@), a subsequent lessee, and intervening royalty
interest owners[1]
brought suit against Exxon Corp. and Exxon Texas, Inc., as successor in
interest to Humble Oil & Refining Co. (AExxon@), for wrongful conduct in the development and
abandonment of oil and gas wells in the Mary Ellen O=Connor Field, near Refugio, Texas.  The trial court granted Exxon=s motion for directed verdict and entered a
take-nothing judgment against Emerald.[2]  The jury found in favor of the royalty
interest owners on their causes of action against Exxon for waste and breach of
contract and awarded the intervenors both actual and punitive damages.  The trial court entered judgment in accordance
with the verdict.  All parties have
appealed.  The judgment is affirmed in
part and reversed in part.     

                                                                  I.  Background

Exxon leased the mineral interests on several
thousand acres, the Mary Ellen O'Connor Field, near Refugio, Texas.  Exxon's interest in the property spanned four
decades beginning in the 1950's and was derived from four separate leases.[3]  The leases are atypical of many oil and gas
leases in some respects.  They include,
for instance, an unusually high fifty percent royalty obligation and stringent
surrender clauses. 








Beginning in the early 1970s, Exxon attempted to
negotiate a reduction in its fifty percent royalty obligation on the
field.  Exxon owned an interest in a
contiguous tract operated by Quintana, and its royalty obligation on that tract
was substantially lower and thus more favorable for Exxon.  Exxon told the royalty interest owners that
the Mary Ellen O=Connor Field was no longer economical to operate,
although Exxon continued production on the adjacent tract operated by
Quintana.    

In considering Exxon=s
request for a reduction in royalty interest, the royalty owners requested that
Exxon provide them information and documentation regarding the productivity of
the field.  Under the terms of the
leases, the lessors were entitled to Afull information@
covering all operations, including logs, reports, analyses, data, and
information concerning oil and gas potentialities for the field.  

Exxon initially refused to provide the royalty
interest owners information on  grounds
that it was proprietary, then that the information would be too difficult to
locate and retrieve, and finally, that the information would be made available
only if a confidentiality agreement were signed.  Nevertheless, Exxon ultimately provided the
royalty interest owners a Areading room@ containing documentation on the field.  The reading room, however, did not contain
all information on the field:  Exxon did
not include any interpretive data and did not include all of the well logs for
the field.  Some data on the field was
not produced until discovery in the instant lawsuit, and some data, including
calculations made by Exxon employee Joel Wylie regarding the productivity of
the field and some of the well logs, was missing even at the time of trial.








The royalty interest owners suggested several
options in renegotiating the terms of the lease.  One of the options was a lower royalty
obligation that would increase if productivity on the field increased.  Exxon refused.  After the failure of additional negotiations,
the royalty interest owners began looking for a new lessee for the field.  Exxon initially refused to allow another
operator to take over the lease without a release.  All negotiations ultimately proved
unsuccessful.  Accordingly, Exxon plugged
and abandoned the wells.  

Emerald became interested in leasing a portion of
the tract originally leased by Exxon. 
Emerald examined the economic viability of assuming operations on the
property by reviewing Exxon=s public filings on the field with the Texas
Railroad Commission.  In so doing,
Emerald reviewed the Texas Railroad Commission Form W-3 Plugging Reports, which
specify the methodology used to plug and abandon the wells.  Emerald ultimately leased a portion of the
field originally held by Exxon.

Upon acquiring the lease and starting the reentry
process, Emerald encountered numerous unexpected obstacles in its redevelopment
of the field.  Emerald discovered tubing,
refuse, and junk in some of the wellbores. 
Emerald also discovered cut casing,[4]
unidentified plugs, or plugs located at intervals differing from those
identified on the Form W-3s, and other obstructions in the wells.  Various wells contained tank bottoms or other
environmental contaminants.  Ultimately,
Tommy Lynch of Emerald estimated that eighty to ninety percent of the Form W-3s
failed to accurately describe the plugging methodology utilized for the wells
and failed to accurately describe the physical status of the wells.  








Emerald retained several different experts in the
field of reentering plugged wells to assist it in the reentry process.  Nevertheless, the problems were not isolated
and the wells were uniformly difficult and disproportionately expensive, or
impossible, to reenter.  Emerald also
requested, but failed to receive, the well records directly from Exxon.  Emerald ultimately obtained several of Exxon=s well logs for the field from Quintana.  The plugging procedures delineated in these
well logs differed in salient respects from those described in Exxon=s public filings regarding the same wells.  After reviewing these documents, speaking
with its experts, and talking with several individuals who had performed some
of the plugging at Exxon=s direction, Emerald concluded that Exxon had
engaged in a deliberate pattern of sabotaging the wells in the Mary Ellen O=Connor Field to prevent reentry, while continuing to
profit from operations on the contiguous tract. 
Emerald and the royalty owners brought suit against Exxon for, inter
alia, common law waste, statutory waste, negligence per se, and tortious
interference.  Based on field analyses
produced by Exxon during discovery, the royalty owners further brought suit
against Exxon for breach of contract by failing to fully develop the field. 

                                                              II.  Exxon=s Appeal

                                                                 A.  Introduction








The jury found against Exxon and in favor of the
royalty owners on all issues submitted. 
The jury found that Exxon committed waste on property or production in
which the royalty owners owned an interest, and that, in plugging the wells,
Exxon failed to act as a reasonably prudent operator would have under the same
or similar facts and circumstances.  The
jury found that the intervenors discovered, or, in the exercise of due
diligence, should have discovered the waste on January 24, 1995.  The jury awarded the intervenors $5,000,000
for the cost to drill new wells, the value of the minerals that could not be
recovered, and the loss of bonus payments. 
The jury also found that Exxon acted with malice and awarded the
intervenors $10,000,000 in exemplary damages.

The jury further found that Exxon failed to comply with
the development provision in the leases that required Exxon to Aprosecute diligently a continuous drilling and
development program until said tract is fully developed for oil and gas,@ and that Exxon fraudulently concealed its failure
to develop the field.  The jury found
that the intervenors knew, or in the exercise of reasonable diligence, should
have known that Exxon fraudulently concealed its failure to fully develop under
the leases in February of 1999.  The jury
awarded the intervenors $3,600,000 for Exxon=s
breach of contract, as the amount that the intervenors Awould have received for the minerals produced had
Exxon fully developed the Oil and Gas Leases less the costs of operation and
production and any royalty received from Emerald Oil & Gas L.C.@

The trial court rendered judgment on the verdict and
awarded the intervenors $8,600,000 in actual damages, $10,000,000 in punitive
damages, and $2,795,000 in prejudgment interest.  Exxon appeals this judgment by eleven issues
and numerous subissues.

                                                B.  Statute of Limitations for Waste








In several issues, Exxon contends that the statute
of limitations bars the intervenors= waste claim. 
In its first issue, Exxon argues that limitations bars the intervenors
from recovering on their waste claim because they filed suit against Exxon more
than two years after Exxon completed its plugging operations.  In its second issue, Exxon contends that the
trial court erred in allowing the intervenors to rely on the discovery rule to
delay the running of limitations on their Aotherwise time-barred@ waste
claim.  In subissues, Exxon argues that
the discovery rule is inapplicable (a) when the intervenors have taken the
position that their waste claim is merely for temporary injury to real
property; (b) when, in a typical waste case, the nature of the injury is
readily discoverable from a wide variety of sources, including public documents
and an inspection of the premises; and (c) when the evidence of any damages is
necessarily the subject of an expert swearing match that precludes the evidence
from being objectively verifiable.  In a
fourth subissue, Exxon claims that, even if the discovery rule arguably applies
to the waste claim, the intervenors are precluded from relying on the discovery
rule because the evidence Aconclusively@ shows that they knew or reasonably should have
known of their injury more than two years before filing suit. 

Statutes of limitations are intended to compel
plaintiffs to assert their claims Awithin a reasonable period of time while the
evidence is fresh in the minds of the parties and witnesses.@  Wagner
& Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734 (Tex. 2001) (citing Computer
Assocs. Int=l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)).  Generally, when a cause of action accrues is
a question of law.  Provident Life
& Accident Ins. Co. v. Knott, 128 S.W.3d 211, 221 (Tex. 2003).  We review questions of law de novo, without
deference to the trial court's conclusions. State v. Heal, 917 S.W.2d 6,
9 (Tex. 1996).

As a general rule, a cause of action accrues and the
statute of limitations begins to run when facts come into existence that
authorize a party to seek a judicial remedy. 
Provident Life & Accident Ins. Co., 128 S.W.3d at 221.  In most cases, a cause of action accrues when
a wrongful act causes a legal injury, regardless of when the plaintiff learns
of that injury or if all resulting damages have yet to occur.  Id.; see S.V. v. R.V, 933
S.W.2d 1, 4 (Tex. 1996). 








The discovery rule exception to the statute of
limitations operates to defer accrual of a cause of action until the plaintiff
knows or, by exercising reasonable diligence, should know of the facts giving
rise to the claim.  Horwood, 58
S.W.3d at 734. 

The injury at issue in the instant case is the waste
of hydrocarbons.  The statute of
limitations for waste is two years.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 16.003(a) (Vernon 2002).  The jury found that the intervenors
discovered, or in the exercise of due diligence, should have discovered the
waste on January 24, 1995.  Intervenors
first brought suit against Exxon in August and September of 1996, less than two
years after the date found by the jury.  

Exxon contends that the statute of limitations bars
the intervenors= recovery for waste given that the intervenors filed
suit against Exxon more than two years after Exxon completed its plugging
operations in the field.  According to
the evidence adduced at trial, Exxon plugged and abandoned all of the wells in
the field by August 16, 1991.  We agree
that the statute of limitations would bar intervenors= cause of action for waste unless the discovery rule
applies to defer accrual of this cause of action.  








Exxon first contends that the discovery rule is not
applicable because the intervenors claim that their waste claim is a temporary
injury to real property, as opposed to a permanent injury to real
property.  The supreme court has
recognized, but not addressed, the issue regarding whether the categorization
of an injury as permanent or temporary affects the running of limitations.  See HECI Exploration Co. v. Neel, 982
S.W.2d 881, 885-86 (Tex. 1998) (ATo resolve the issues in this case, we need not
decide whether the injury . . . was permanent or temporary and the effect, if
any, that distinction may have on limitations.@).  Compare Mitchell Energy Corp. v. Bartlett,
958 S.W.2d 430, 436 (Tex. App.BFort Worth 1997, writ denied) (discussing discovery
rule when injury to water well was found to be permanent injury to real
property) with Apache Corp. v. Moore, 891 S.W.2d 671, 679-80 (Tex. App.BAmarillo 1994, writ denied) (holding that injury to
royalty interest was a temporary injury), vacated on other grounds, 517
U.S. 1217 (1996).

As recently articulated by the Texas Supreme Court,
there are three distinct consequences that result from categorizing an injury
as permanent or temporary:  (1) whether
damages are available for future or only past injuries; (2) whether one or a
series of suits is required; and (3) whether claims accrue, and thus
limitations begin, with the first or each subsequent injury.  Schneider Nat'l Carriers, Inc. v. Bates,
147 S.W.3d 264, 275 (Tex. 2004) (discussing the law of nuisance).  In terms of limitations, a permanent nuisance
claim accrues when injury first occurs or is discovered; a temporary nuisance
claim accrues anew upon each injury.  See
id. at 270. 

Exxon=s argument that recovery is barred is untenable for
a number of reasons.  








First, Exxon seizes upon argument made by counsel at
trial, outside the presence of the jury, in support of its assertion that
intervenors claim theirs was a temporary injury.  However, Exxon=s
argument ignores the fact that the intervenors submitted and received favorable
jury findings awarding damages for the cost to drill new wells, the value of
the minerals that cannot be recovered, and the loss of bonus payments.  Accordingly, we cannot say that the
intervenors have wholly characterized their damages as temporary.  See Tex.
R. Civ. P. 48 (parties may plead alternative or hypothetical theories
and allege claims or defenses that are inconsistent); Tex. R. Civ. P. 47 (plaintiff may ask for relief in the
alternative or of several different types).  
More importantly, the determination whether an injury is categorized as
temporary or permanent is either made by the court, as a matter of law, or is a
question of fact for the jury.  See
Schneider, 147 S.W.3d at 281.  The
parties= own characterization of the claims at issue is not
controlling.

Second, contrary to Exxon=s position, the discovery rule may apply whether the
injury is permanent or temporary.  See
id. at 291 n.138; see generally Bayouth v. Lion Oil Co., 671 S.W.2d
867, 868 (Tex. 1984); cf. Burke v. Union Pac. Res. Co., 138 S.W.3d 46,
60 (Tex. App.BTexarkana 2004, pet. denied) (AIn actions for damage to property, Texas courts have
consistently applied the discovery rule.@).

Third, and finally, we question the applicability of
the distinction between temporary and permanent damage to land, traditionally
applied in nuisance cases, to a case involving waste of oil and gas and breach
of contract.  The injuries in the instant
case do not readily fall within either temporary or permanent categories, and
in fact display aspects of both.        Exxon next contends that the discovery
rule does not apply in this case because the alleged waste was neither
inherently undiscoverable nor objectively verifiable.  The discovery rule applies if (1) the injury
is inherently undiscoverable, and (2) the evidence of the injury is objectively
verifiable.  HECI Exploration Co.,
982 S.W.2d at 886; Velsicol Chem. Corp. v. Winograd, 956 S.W.2d 529, 531
(Tex. 1997). 








An injury is inherently undiscoverable if it is, by
its nature, unlikely to be discovered within the prescribed limitations period
despite due diligence.  Horwood,
58 S.W.3d at 734-35; Altai, 918 S.W.2d at 456.  We determine whether an injury is inherently
undiscoverable on a categorical basis because such an approach Abrings predictability and consistency to the
jurisprudence.@ Apex Towing Co. v. Tolin, 41 S.W.3d 118, 122
(Tex. 2001).  Accordingly, the question
here is not whether the intervenors discovered their injury during the
limitations period, but whether the intervenors=
injury is Athe type of injury that generally is discoverable by
the exercise of reasonable diligence.@  HECI,
982 S.W.2d at 886.

As owners of mineral interests, intervenors had some
obligation to exercise reasonable diligence in protecting their interests.  Horwood, 58 S.W.3d at 735.  Intervenors could turn to the lessee for
information and could look to records publicly filed with the Railroad
Commission.  However, neither source
would indicate waste of hydrocarbons. 
Damage to subsurface wellbores cannot be determined by visual inspection
or even a review of publicly available records. 
We note that intervenors need not prove that the injury was impossible
to discover, but only that it was difficult to learn of the injury.  See S.V., 933 S.W.2d at 7.  We hold that waste as alleged in this case
is, by its nature, unlikely to be discovered within the prescribed limitations
period despite due diligence.   

We next consider whether the injury is objectively
verifiable.  An injury is objectively
verifiable if the presence of injury and the producing wrongful act cannot be
disputed, and the facts upon which liability is asserted are demonstrated by
direct, physical evidence.  Altai,
918 S.W.2d at 455; S.V., 933 S.W.2d at 6‑7; Hay v. Shell Oil
Co., 986 S.W.2d 772, 777 (Tex. App.BCorpus Christi 1999, pet. denied).  While expert testimony alone does not
suffice, recognized expert opinion on a particular subject could be so near
consensus that, in conjunction with objective evidence, it could provide the
verification required.  Hay, 986
S.W.2d at 777; see S.V., 933 S.W.2d at 15.








In the instant case, the record is replete with
physical evidence pertaining to the intervenors=
injury, that is, cut casing, shifted casing, refuse and other junk in the
wellbores, and unexpected plugs and obstacles in the wellbores.  Experts testified that the wells were
damaged.  It is undisputed that Exxon was
the party responsible for plugging and abandoning the wells in the field.  Accordingly, intervenors= injury is objectively verifiable.  Compare Gaddis v. Smith, 417 S.W.2d
577, 578 (Tex. 1967) (presence of sponge in plaintiff's body and how it got
there were undisputable) with Robinson v. Weaver, 550 S.W.2d 18, 21‑22
(Tex. 1977) (negligent diagnosis is subject to proof only by expert hindsight,
and therefore discovery rule does not apply). 

We conclude that the intervenors= injury is inherently undiscoverable and the
evidence of injury is objectively verifiable. 
Accordingly, the discovery rule applies. 
HECI Exploration Co., 982 S.W.2d at 886

            In its fourth subissue, Exxon claims
that, even if the discovery rule applies, the intervenors are precluded from
relying on the discovery rule because the evidence Aconclusively@ shows that they knew or reasonably should have
known of their injury more than two years before filing suit.  Exxon focuses its argument on a June 1994
letter from Tom Taylor at Emerald to the intervenors, explaining the progress
of reentry on some of the wells. 
Specifically, Exxon points to language in the letter indicating that
casing had been cut on the B-11, B-1, and A-3 wells and that junk had been
found in the A-10 well.         In a trial on the merits, the party
seeking the benefit of the discovery rule to avoid limitations has the burden
of pleading and proving the discovery rule. 
Woods v. William M. Mercer, 769 S.W.2d 518, 518 (Tex. 1988).  Inquiries involving the discovery rule
usually entail questions for the trier of fact. 
Childs v. Haussecker, 974 S.W.2d 31, 44 (Tex. 1998).  However, the commencement of the limitations
period may be determined as a matter of law if reasonable minds could not
differ about the conclusion to be drawn from the facts in the record.  Id. 














In the instant case, the jury found that the
intervenors discovered or in the exercise of due diligence should have
discovered the waste, if any, by Exxon, on January 24, 1995.  According to the testimony adduced at trial,
this is the date on which representatives from Emerald met with the intervenors
and informed them about the full extent of damage to the wells and the numerous
discrepancies between the public reports on the pluggings and Emerald=s actual findings regarding the wells.  By this time, Emerald had consulted with many
reentry specialists.  According to Glenn
Lynch of Emerald, the royalty interest owners had asked for a status on the
lease, and at this time he felt it was important to disclose to the royalty
interest owners the condition of their mineral interests.  At this January meeting, Lynch told the
royalty interest owners that the problems with the wells were not isolated but
were pandemic and that the problems were unusual and atypical.         We
conclude that the 1994 letter does not establish discovery of the waste as a
matter of law.  Instead, the discovery
rule tolls limitations until the intervenors knew of enough damage to know that
the problems regarding the wells were not isolated.  PPG Indus. v. JMB/Houston Ctrs. Ltd. P'ship,
146 S.W.3d 79, 94 (Tex. 2004).  There
were 121 wells on the field, and the letter references reentry or the
commencement of reentry on only 14 wells as of June 8, 1994.  Based on the testimony at trial, it would not
be unexpected to encounter a few difficulties in reentering some of the
wells.  In short, we are not willing to
say that finding a few isolated problems on a small number of the wells that
had been reentered to date establishes field-wide knowledge regarding systemic
damage to some numerous wells as a matter of law.  See id.; Cornerstones Mun. Util.
Dist. v. Monsanto Co., 889 S.W.2d 570, 576‑77 (Tex. App.BHouston [14th Dist.] 1994, writ denied) (discovery
rule does not end when the first leak is discovered; nor does it continue until
all the leaks are known; instead, it ends when an owner knows of enough leaks
to indicate the problem is not isolated); Bayou Bend Towers Council of Co‑Owners
v. Manhattan Constr. Co., 866 S.W.2d 740, 742‑43 (Tex. App.BHouston [14th Dist.] 1993, writ denied) (holding
same with respect to leaking windows and roof). 
Thus, the earliest point at which intervenors can be properly charged
with knowledge of the damage is, as the jury found, January 1995, which is less
than two years before they filed suit in September 1996.

We overrule Exxon=s
first two issues and its numerous subissues regarding the statute of limitations
for waste. 

                                             C.  Statutory and Common Law Waste

In its third issue, Exxon argues that the trial
court erred in granting judgment in favor of the intervenors on the basis of
the jury=s finding that Exxon committed waste. In subissues,
Exxon argues that: (a) the intervenors are precluded from recovering for
statutory waste when section 85.321 of the Texas Natural Resources Code does
not create a private cause of action for waste, and only prohibits waste in
certain contexts; (b) the intervenors= cause of action for common law waste sounds only in
contract and not in tort; (c) the trial court erred in instructing the jury
that the term Awaste@ may include Awhatever dictates of reason, fairness, and good
judgment under all the facts would lead one to conclude was wasteful,@ when that definition is not found in the Texas
Natural Resources Code; (d) the evidence is legally and factually insufficient
to support a finding that Exxon committed common law waste or statutory waste;
and (e) the Dunn and O=Connor intervenors are precluded from recovering
under a theory of common law waste because they failed to plead such a theory. 

                                                              1.  Statutory Waste








We first address Exxon=s
contention that there is not a statutory cause of action for waste.  We have previously addressed this issue in a
companion case, Emerald Oil & Gas, L.C. v. Exxon Corp., No.
13-99-757-CV, 2005 Tex. App. LEXIS 591 (Tex. App.BCorpus
Christi Jan. 27, 2005, pet. filed), and we now reiterate our conclusion that
there is a private cause of action for statutory waste.  See id. at *12-*14.  Although Exxon argues to the contrary,
section 85.321 of the Texas Natural Resources Code provides a statutory cause
of action for waste.  Section 85.321 of
the code states that:

A party who owns an interest in property or
production that may be damaged by another party violating the provisions of
this chapter that were formerly a part of Chapter 26, Acts of the 42nd Legislature,
1st Called Session, 1931, as amended, or another law of this state prohibiting
waste or a valid rule or order of the commission may sue for and recover
damages and have any other relief to which he may be entitled at law or in
equity.  Provided, however, that in any
action brought under this section or otherwise, alleging waste to have been
caused by an act or omission of a lease owner or operator, it shall be a
defense that the lease owner or operator was acting as a reasonably prudent
operator would act under the same or similar facts and circumstances.

 








Tex. Nat. Res. Code Ann. ' 85.321 (Vernon 2001).  This language is clear and unambiguous, and
we will interpret it as written.  Our
reading of the statute is in accord with other cases referencing the effect of
section 85.321.  See HECI Exploration
Co., 982 S.W.2d at 890 (AWhen a mineral or royalty interest owner is damaged
by a violation of the conservation laws of this state or a Railroad Commission
rule or order, section 85.321 of the Texas Natural Resources Code . . .
expressly provides for a damage suit against the offending operator.@); In re Apache Corp., 61 S.W.3d 432, 435
(Tex. App.BAmarillo 2001, orig. proceeding) (through section
85.321, Athe legislature unmistakably declared its intent to
allow those owning an interest in realty who have suffered injury due to a
violation of some rule or order of the TRC to sue for and recover damages and
other relief.@); H.G. Sledge, Inc. v. Prospective Inv. &
Trading Co., 36 S.W.3d 597, 606 n.10 (Tex. App.BAustin 2000, pet. denied) (acknowledging that
section 85.321 Aprovides jurisdiction for suits for damages@); see also Turnbow v. Lamb, 95 F.2d 29, 31
(5th Cir. 1938) (construing predecessor statute). 

Contrary to these authorities, Exxon relies on Magnolia
Petroleum Co. v. Blankenship, 85 F.2d 553 (5th Cir. 1936), for the
proposition that the predecessor to section 85.321 Adid not grant a new, private cause of action for
damages or other relief not previously available to a property owner or
producer.@  See id. at
556.  We conclude that such reliance is
misplaced, however, because the Fifth Circuit=s
decision in 1936 concerned the enforcement of a Railroad Commission order
rather than a matter of civil litigation between private parties.  See id.  Furthermore, we are guided by the precedent of
the Texas Supreme Court and our sister appellate courts, who have addressed the
issue as discussed above.

Our conclusion is also supported by the fact that
other provisions of the natural resources code also recognize private causes of
action.  See, e.g., Tex. Nat. Res. Code Ann. ' 111.095 (Vernon 2001); id. ' 134.182 (Vernon 2001).  Moreover, such an interpretation is
consistent with the overall legislative intent to prevent waste and preserve
natural resources.  See, e.g., Tex. Nat. Res. Code Ann. ' 89.001 (Vernon 2001) (stating that the Aconservation and development of all natural
resources of this state are declared to be a public right and duty@).  In this
regard, we reiterate that the preservation of our natural resources is an issue
of constitutional dimension.  See Tex. Const. art. 16, ' 59 (stating that Athe
preservation and conservation of all such natural resources of the State are
each and all hereby declared public rights and duties; and the Legislature
shall pass all such laws as may be appropriate thereto@).








Exxon next argues that the natural resources code
only prohibits waste in the Aproduction, storage, or transportation@ of oil or gas. 
See Tex. Nat. Res. Code
Ann. ' 85.045 (Vernon 1993).  According to Exxon, the intervenors do not
complain about production, storage, or transportation of oil or gas, but
instead complain only that Exxon committed waste in plugging.  We disagree with Exxon=s narrow reading of the natural resources code.  See
Tex. Nat. Res. Code Ann. ' 85.045 (offering various definitions of waste); R.R.
Comm=n v. Shell Oil Co., 146 Tex. 286, 206 S.W.2d 235, 240 (1947) (discussing similar language
in precursor statute regarding production, storage, or transportation as Asweeping language . . . by which all waste in the
handling of oil and gas was declared unlawful@).  Based on the plain language of the code and
long-standing precedent from the Texas Supreme Court, we conclude that the code
prohibits all waste of oil or gas, including the type of waste caused by Exxon
in the instant case.  See Tex. Nat. Res. Code Ann. ' 85.045; Shell Oil Co., 26 S.W.2d at 240.   

                                                          2.  Contract or Tort Law

Exxon further contends that the intervenors may not
recover for common law waste because the intervenors= cause of action sounds in contract rather than tort
law.  According to Exxon, its duties and
responsibilities were governed wholly by the lease.








A party=s actions can breach duties in tort, contract, or
both.  See Jim Walter Homes, Inc. v.
Reed, 711 S.W.2d 617, 618 (Tex. 1986). 
In determining the type of action brought, we look to the substance of
the cause of action rather than the manner in which the party pleaded the cause
of action.  Id. at 617-18.  In determining whether a plaintiff=s cause of action can be characterized as a breach
of contract or a tort, the courts (1) look to the source of the defendant=s duty to act, and (2) consider the nature of the
remedy or damages sought by the plaintiff. 
Southwestern Bell v. DeLanney, 809 S.W.2d 493, 494-95 (Tex.
1991).

We reject Exxon=s contention. 
In the instant case, the source of Exxon=s duty
to act arises not only from the lease, but also from the common law.  Texas law has long recognized that a cause of
action for negligent waste or destruction of minerals may be maintained by a
mineral or royalty owner.  Elliff v.
Texon Drilling Co., 146 Tex. 575, 583, 210 S.W.2d 558, 563 (1948); see
Amoco Prod. Co. v. Alexander, 622 S.W.2d 563, 572 (Tex. 1981).  Exxon=s duty to avoid waste is grounded in prohibitions
against waste so fundamental that they are enshrined in the Texas
constitution.  See Tex. Const. art. 16, ' 59.  We reach
the same result when we consider the nature of the remedy or damages sought by
the plaintiff.  Southwestern Bell,
809 S.W.2d at 494-95.  The injury is not
merely the economic loss to the subject matter of the contract itself, but
damaged or destroyed wellbores and ultimately, the loss of oil and gas
reserves.  Moreover, in some sense, the
damage enures to citizens of the state and all who are injured by the loss of
fuel.   

Exxon seeks to support its argument with Amoco
Prod. Co. v. Alexander, 622 S.W.2d 563, 571 (Tex. 1981), Abraxas
Petroleum Corp. v. Hornburg, 20 S.W.3d 741, 753 (Tex. App.BEl Paso 2000, no pet.), and Harrison v. Bass
Enters. Prod. Co., 888 S.W.2d 532, 536 (Tex. App.BCorpus Christi 1994, no writ).  These cases are distinguishable.  The duties and injuries in each of these
cases sound in contract alone, and the injured parties were seeking the benefit
of their bargains as provided by the contracts between the parties.  In contrast, in this case, the evidence
adduced at trial indicates a tort separate and apart from the contractual
agreement, that is, the intentional destruction of wellbores and the
intentional prevention of reentry in wells. 
Intervenors= claims based on this destruction are independent
from and unrelated to any contractual relationship between the parties. 








                                                              3.  Jury Instructions








            Exxon next contends that the trial
court erred in instructing the jury that the term Awaste@ may include Awhatever dictates of reason, fairness, and good
judgment under all the facts would lead one to conclude was wasteful@ when that definition is not found anywhere in
Chapter 85 of the Texas Natural Resources Code, which contains the statutory
definition of waste.[5]  However, at trial, Exxon=s objection to this definition was that subpart (d)
was Aunconstitutionally vague and fails to provide the
jury any guidance in answering the question.@  To preserve an issue for appeal, the
objecting party must distinctly point out the objectionable matter and the
specific grounds of the objection.  Tex. R. Civ. P. 274; Tex. R. App. P. 33.1(a).  Otherwise, the objection is waived.  Tex.
R. App. P. 33.1(a).  Where the
objection at trial is not the same as the complaint presented on appeal, the
complaint is not preserved for appellate review.  A.G.E., Inc. v. Buford, 105 S.W.3d
667, 678 (Tex. App.BAustin 2003, pet. denied); Borden Inc. v. Guerra,
860 S.W.2d 515, 525 (Tex. App.BCorpus Christi 1993, writ dism'd by agr.); Exxon
Corp. v. Allsup, 808 S.W.2d 648, 655 (Tex. App.BCorpus Christi 1991, writ denied).

                                          4.  Legal and Factual Sufficiency of Waste

Exxon further argues that the evidence is legally
and factually insufficient to support a finding of common law waste or
statutory waste. 

When a party not bearing the burden of proof on an
issue challenges the legal sufficiency of the evidence, we view the evidence in
the light most favorable to the jury's finding, disregarding all evidence and
inferences to the contrary.  Lenz v.
Lenz, 79 S.W.3d 10, 19 (Tex. 2002). 
If more than a scintilla of evidence supporting the finding exists, we
uphold the finding.  Id.  When reviewing a factual sufficiency
challenge, we examine the entire record to determine whether the evidence
supporting the finding is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and manifestly unjust.  Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986) (per curiam).








We examine the record for evidence regarding the
physical or economic waste or loss of hydrocarbons.  See Tex.
Nat. Res. Code Ann. ' 85.045(3), (6), (11); R.R. Comm=n v. Rowan Oil Co., 152 Tex. 439, 259 S.W.2d 173 (1953); Shell Oil Co., 206 S.W.2d
at 240.  In the instant case, the
majority of the wells plugged by Exxon were difficult or impossible to reenter,
and the costs associated with reentry were accordingly much higher than would
have ordinarily been expected.  The
difficulties in reentry resulted from junk and other debris in the wellbores
and from cut, rather than perforated, casings. 
Based on our review of the record evidence, numerous items were
discovered in the wellbores, including wrenches, drilling bits, a packer, nuts,
bolts, tubing, pieces of pipe, and assorted nondrillable junk.  On at least one of the wells, Abuckets@ of debris were removed.  On others, nondrillable materials in the
wellbore prevented or hampered reentry. 
At trial, Exxon=s witnesses did not dispute that (1) there was junk
in the wells, (b) Exxon was the only party who could have put the junk in the
wells, or (c) junk in the wells made reentry difficult or impossible.

At trial, the evidence indicated that the Mary Ellen
O=Connor Field was the only instance in which Exxon
determined to plug and abandon an entire field, including producing wells.  Matt Soulant, Exxon=s division operation manager over South Texas, and
other Exxon employees, acknowledged and agreed that cutting the casing, as opposed
to perforating it, would make it impossible or at least more difficult to
reenter a well.  However, Soulant
testified that the degree of difficulty required to reenter a well is not a
consideration in plugging the well.  From
his perspective as an operations manager in the South Texas area, once a well
was plugged and abandoned, he had no future concern with what occurred to that
wellbore. 

Other Exxon employees and former employees testified
that cutting and leaving the casing was contrary to Exxon=s usual practices in plugging and abandoning
wells.  Some testimony indicated that it
was both more costly and more time-consuming to cut and abandon the casing.








Lonnie Vickery, who worked for Exxon during the
plugging procedures, questioned his supervisor, Joe Gilpin, regarding why Exxon
was cutting casing rather than perforating it on the Mary Ellen O=Connor Field, and Ahis
answer to me was, it was a deterrent,@ and AExxon felt like they drilled these wells, they
bought the casing that ran in these wells, these were their wells, and they
would plug them any way they wanted to, and they didn=t want anybody going back into them.@  Gilpin
denied this exchange at trial.  Vickery
also testified that he plugged producing wells on the Mary Ellen O=Connor Field. 
At the instructions of Jerry Schave, Vickery pumped approximately 1,000
to 1,500 barrels of tank bottoms into a producing well over the course of two
to three days.  According to Vickery, Ayou=ve got to know, when you=re doing that, you=re
destroying that formation.  I mean you=re doing some severe damage to that gas
formation.  There=s no ifs, ands or buts about that.@  Other
experts testified that the plugging procedures used in the Mary Ellen O=Connor Field were singular, violative of standard
practices, and definitely Avindictive.@          With respect to resultant economic and physical
waste, Emerald declined a second lease on the field specifically because of the
damage to the wellbores.  The royalty
interest owners and their expert George Hite testified that the intervenors
would be unlikely to obtain a lease on the portion of the original Exxon lease
not already leased by Emerald.   Reentry
costs on the wells far exceeded the norm. 
Some wells could not be reentered. 
There was testimony that Emerald was unable to reenter productive zones
due to the condition of the casing.  According
to Hite, reserves were lost which could not be recovered.     

Although there was conflicting testimony, we will
not substitute our judgment for that of the jury's. Golden Eagle Archery,
Inc., v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (AThe jury is the sole judge of the credibility of
witnesses and the weight to be given their testimony.@). We conclude the evidence is legally and factually
sufficient to support the jury=s finding that Exxon committed waste. 

                                                    5.  Sufficiency of the Pleadings








Exxon argues that the Dunn and O=Connor intervenors are precluded from recovering
under a theory of common law waste because they failed to plead such a
theory.  In the instant case, Emerald=s petition against Exxon included a specific
paragraph including the phrase Acommon law waste@ as
part of its title; however, the petition in intervention filed by the Dunn and
O=Connor intervenors lacked any such specific title or
caption.    

We disagree with Exxon=s
contention.  

A judgment must be based upon pleadings, and a
plaintiff may not sustain a favorable judgment on an unpleaded cause of action,
in the absence of trial by consent.  Stoner
v. Thompson, 578 S.W.2d 679, 682‑83 (Tex. 1979); Oil Field Haulers
Ass=n, Inc. v. R.R. Comm=n, 381
S.W.2d 183, 191 (Tex.  1964).  The general rules concerning pleadings apply
with equal force to an intervenor.  See
Tex. R. Civ. P. 61. 

Texas follows a Afair
notice@ pleading standard, which looks to whether the
opposing party can ascertain from the pleading the nature and basic issues of
the controversy and what testimony will be relevant at trial.  Horizon/CMS Healthcare Corp. v. Auld, 34
S.W.3d 887, 896 (Tex. 2000).  A pleading
will be liberally construed in favor of the pleader and is sufficient if it
gives fair and adequate notice of the facts upon which the pleader bases his
claim.  Stone v. Lawyers Title Ins.
Corp., 554 S.W.2d 183, 186 (Tex. 1977); see Tex. R. Civ. P. 45, 47. 
A court should uphold the petition as to a cause of action that may be
reasonably inferred from what is specifically stated, even if an element of the
cause of action is not specifically alleged. 
Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex. 1993).








In the instant case, the Dunn and O=Connors= fourth amended petition includes numerous factual
allegations regarding Exxon=s actions with regard to waste, that is, the
negligent waste or destruction of oil and gas. 
This petition specifically references the petition filed by Emerald and
includes sections that expressly discuss Exxon=s
failure to act as a reasonably prudent operator and Exxon=s negligence, both of which establish elements of
the claim of waste.  The petition states
that ADefendants= conduct in the plugging and abandonment of the
subject wells breaches the statutory duty to plug and abandon wells according
to the Railroad Commission and the duty to not commit waste of natural
resources@(emphasis added). 
The fourth amended petition is identical to that filed by the other
intervenors with regard to the factual allegations of waste and, in comparison,
only lacks a caption regarding common law waste.  See Brown v. Henderson, 941 S.W.2d
190, 192 (Tex. App.BCorpus Christi 1996, no writ) (petition does not
need to set forth formal title of the DTPA or indicate the specific sections in
order to allege a DTPA claim). 
Construing the pleadings liberally, we conclude that the petition in
intervention gave Exxon fair notice of the cause of action at issue.  

Furthermore, even if we were to conclude that the
common law waste claim was not included in the petition, we would conclude the
issue was effectively tried by the implied consent of the parties.  Tex.
R. Civ. P. 67.  In such instances,
the issues shall be treated in all respects as if they had been raised in the
pleadings.  See id.  The failure to amend the pleadings shall not
affect the result of the trial on these issues. 
Id.  








Finally, if a petition omits an element of a cause
of action or fails to state it with sufficient clarity, the defendant must
specially except to the petition or he has waived his complaint.  See Tex.
R. Civ. P. 90; Harlingen Irrigation Dist. v. Caprock Communications
Corp., 49 S.W.3d 520, 534 (Tex. App.BCorpus Christi 2001, pet. denied).  We note that Exxon filed a motion for leave
to file an amended answer, including special exceptions, to the fourth amended
petition; however, the record neither indicates that the court allowed Exxon to
file its amended answer nor includes any ruling regarding the special
exceptions therein.   Further, Exxon=s proposed special exceptions do not address the
cause of action for waste.     

We overrule Exxon=s
third issue and various subissues concerning waste.

                                              D.  The Reasonably Prudent Operator

In its fourth issue, Exxon argues that the evidence
conclusively establishes Exxon=s defense that it acted as a reasonably prudent
operator.  According to Exxon, cutting
the casing on the wells was the best way for it to ensure that no oil or gas
could leak into the groundwater or otherwise cause environmental
contamination.  Exxon requested and obtained
a jury question on its reasonably prudent operator defense.  The jury found that Exxon had not acted as a
reasonably prudent operator.

Section 85.321, allowing for a suit for damages,
provides, in part:

[I]n any action brought under this section or
otherwise, alleging waste to have been caused by an act or omission of a lease
owner or operator, it shall be a defense that the lease owner or operator was
acting as a reasonably prudent operator would act under the same or similar
facts and circumstances.

 








Tex. Nat. Res. Code Ann. ' 85.321.  We
would note that the reasonably prudent operator standard incorporated in the
statute has long been recognized by the common law.  See, e.g., Alexander, 622 S.W.2d at 568; Clifton
v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 690 (1959);  Corzelius v. Harrell, 143 Tex. 509,
186 S.W.2d 961, 967‑68 (Tex. 1945). 
Every claim of improper operation by a lessor against a lessee should be
tested against the general duty of the lessee to conduct operations as a
reasonably prudent operator in order to carry out the purposes of the oil and
gas lease.  Alexander, 622 S.W.2d
at 568.  The reasonably prudent operator
standard is comprised of three elements: (1) to act in good faith; (2) with
competence; and (3) with due regard to the interest of the lessor as well as
its own interest.  Hurd Enters. v.
Bruni, 828 S.W.2d 101, 109 n.10 (Tex. App.BSan
Antonio 1992, writ denied).  

George Hite testified that Exxon did not comply with
Railroad Commission requirements or industry standard in cutting casing without
intending to pull it.  Rock Thomas, hired
as a consultant to Emerald, testified that he had reentered between six and
seven thousand wells, and the Mary Ellen O=Connor Field is the only place he had ever heard of
where cut casing was left in the wellbore. 
Malcom Tudor, who worked for Exxon for more than thirty years and was
the district operations superintendant, testified that he did not recall any
operations involving cutting casing without attempting to pull it, and he could
not think of a reason to cut the casing without attempting to pull it.  All witnesses testified that cut casing and
debris in the wellbores made reentry more difficult or impossible.  Based on the foregoing, there was evidence
that Exxon=s plugging procedures on the Mary Ellen O=Connor field both varied from those it utilized at
other fields and conflicted with industry standards and commission rules.  This is inconsistent with the definition of a
reasonably prudent operator.  The
evidence is legally sufficient to support the jury=s finding, and accordingly, we overrule Exxon=s fourth issue.

                                        E.  Actual Damages for Waste








In its fifth issue, Exxon argues that the trial
court erred in awarding the intervenors $5,000,000 in actual damages for
waste.  In four subissues, Exxon
specifically argues that: (a) the value of unrecovered minerals is an improper
measure of damages for waste, Asuch that there is no evidence of the proper measure
of damages;@ (b) the evidence is legally and factually
insufficient to permit the intervenors to recover any damages for the cost of
drilling new wells when no one ever testified at trial that the intervenors
would actually incur any of the costs of drilling new wells; (c) an award of
damages for lost bonus payments is impermissibly speculative when there is no
evidence that the intervenors actually would have entered into any agreement
which would have allowed them to receive a bonus; and (d) an award of
$5,000,000 in actual damages for waste is excessive when the maximum amount of
damages supported by the intervenors= expert=s testimony was $2,712,500.

With regard to the jury=s finding of waste, the trial court asked the jury
to consider only three elements of damages for waste: (1) the cost to drill new
wells; (2) the value of the minerals that cannot be recovered; and (3) the loss
of bonus payments.  The jury found that
$5,000,000 would Afairly and reasonably@
compensate the plaintiff-intervenors.  

                                                         1.  Unrecovered Minerals

In its first subissue, Exxon contends that the value
of unrecovered minerals is an improper measure of damages for waste, Asuch that there is no evidence of the proper measure
of damages.@  According to
Exxon, the proper measure of damages is the difference in the fair market value
of the property immediately before and after the wasteful actions. 








While Texas cases have not delineated the correct
measure of damages for the loss or destruction of minerals, they have
considered the correct measure of damages for the removal of minerals from a
plaintiff=s land.  In
such a situation, the correct measure of damages depends on whether the defendant
removed the minerals in good faith.  See
Bender v. Brooks, 127 S.W.168, 169-70 (Tex. 1910).  When the removal of minerals is done in good
faith, the plaintiff may recover the minerals= value
in situBthat is, the value of the minerals in the
ground.  Dahlstrom Corp. v. Martin,
582 S.W.2d 159, 161 (Tex. App.BHouston [1st Dist.] 1979, writ ref=d n.r.e.). 
These damages are sometimes referred to as net profit damages.  See Maxvill-Glasco Drilling Co. v. Royal
Oil & Gas Corp., 800 S.W.2d 384, 386 (Tex. App.BCorpus Christi 1990, writ denied).  This measure is the fair market value of the
minerals less the defendant=s cost of bringing them to the surface and to
market.  Bender, 127 S.W. at
170.  In contrast, when minerals are
removed in bad faith, the plaintiff can recover damages for the minerals= enhanced value. 
Karell v. West, 616 S.W.2d 692, 697 (Tex. App.BFort Worth 1981, writ ref=d n.r.e., 628 S.W.2d 48 (Tex. 1982) (per curiam); Dahlstrom
Corp., 582 S.W.2d at 161.  We see no
reason why this law should not apply to ascertain the damages for waste.  

To support its argument, Exxon cites Hamman v.
Ritchie, 547 S.W.2d 698, 705 (Tex. App.BFort
Worth 1977, writ ref=d n.r.e.) (AOn a waste question the measure of damages would be
the difference in market value immediately before and after action as applied
to any particular parcel of land upon which waste was alleged to have been
committed.@).  Hamman
is distinguishable from the instant matter because it does not concern loss of
a mineral estate.  Moreover, after Hamman  was decided, the Texas Supreme Court
clarified the law of waste:  

Waste is defined as >permanent
harm to real property, committed by tenants for life or for years, not
justified as a reasonable exercise of ownership and enjoyment by the possessory
tenant and resulting in a reduction in value of the interest of the reversioner
or remainderman.

 

The common law theory of waste must not be confused
with an action for negligent waste or destruction of minerals which may be maintained
by a mineral or royalty owner.  A royalty
or royalty interest, whether created by grant or reservation or by lease, is an
interest in real property and is a fee simple interest in land

 








This is not a waste case.  There has been no >waste= as defined in section 85.046(a) of the Texas
Natural Resource Code.  There has been no
negligent waste or destruction as occurred in Elliff, supra.  Nor has there been an ultimate loss by a
reversionary or remainder interest.  The
problem is the operation, by a common lessee, of some leases to the detriment
of others.

 

Alexander,
622 S.W.2d at 572.  Accordingly, Hamman
does not control this issue.  The value
of the unrecovered minerals is a proper measure of damages for waste.

                                                          2.  Costs for New Wells 

Exxon argues that the evidence is legally and
factually insufficient to permit intervenors to recover damages for the cost of
drilling new wells when no one testified at trial that intervenors would
actually incur the cost of drilling new wells. 
Ludt v. McCollum, 762 S.W.2d 575, 576 (Tex. 1988) (purchaser of
home could recover for foundation repair even though foundation had not yet
been repaired and costs were not yet incurred); Luna v. North Star Dodge
Sales, Inc., 667 S.W.2d 115, 118 (Tex. 1984) (plaintiff may recover for
loss of use as an element of damage even where no monetary loss had been incurred
by actually renting a replacement vehicle).

The law is clear that if a destroyed well can be
reproduced and the reproduction costs do not exceed the value of the well, the
plaintiff can recover damages for the cost of reproducing and equipping the well.  Atex Pipe & Sup. v. Sesco Prod. Co.,
736 S.W.2d 914, 917 (Tex. App.BTyler 1987, writ denied); Am. Glycerin Co. v.
Kenridge Oil Co., 295 S.W. 633, 636-37 (Tex. App.BEastland 1927, no writ).  Hite testified that seven new wells would
have to be redrilled at a cost of $1.73 million.  








Exxon argues that this cost would have been born by
Emerald and not by the intervenors as lessors. 
However, trial testimony indicated that Emerald declined a second lease
on the property and that intervenors would be unable to procure a new lessee
for the field given the manner in which the wells had been plugged.  Further, Exxon=s
argument fails to consider that the Emerald lease only encompassed a small
portion of the total land leased by Exxon. 
Allowing the jury to consider that the intervenors would have to bear
some of the costs for drilling new wells accords with the evidence adduced at
trial.

                                                          3.  Lost Bonus Payment   

Exxon argues that the award of damages for lost
bonus payments is improper because it is speculative.  There can be no recovery for damages which
are speculative or conjectural.  Lefton
v. Griffith, 136 S.W.3d 271, 277 (Tex. App.BSan
Antonio 2004, no pet.); Cone v. Fagadau Energy Corp., 68 S.W.3d 147, 159
(Tex. App.BEastland 2001, pet. denied).  

According to testimony at trial, Emerald had agreed
to pay intervenors a bonus of $600,000 for a second lease.  The proposed lease, reflecting the $600,000
bonus payment, was in evidence.  Glenn
Lynch, for Emerald, testified that Emerald reached an agreement with all
royalty owners to lease the deep rights to a large portion of the property, but
Lynch decided not to go through with the proposed lease because of workover and
reentry problems.  Michael O=Connor testified that intervenors would have entered
into the lease but for the fact that Emerald did not pursue it.  Both parties to the proposed lease directly
traced the failure of the lease to the damages caused by Exxon. 

Based on the foregoing testimony, we find no merit
in Exxon=s arguments that the intervenors= lost bonus damages are not recoverable because they
are too speculative.  4.  Sufficiency of the Evidence








Exxon contends the evidence is legally and factually
insufficient to support an award of $5,000,000 in actual damages for
waste.  The standard of review for an
excessive damages complaint is factual sufficiency of the evidence.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 406 (Tex. 1998); Brownsville Pediatric Ass=n v. Reyes,
68 S.W.3d 184, 191 (Tex. App.BCorpus Christi 2002, no pet.); N. Am. Refractory
Co. v. Easter, 988 S.W.2d 904, 912 (Tex. App.BCorpus
Christi 1999, pet. denied).  We examine
all of the evidence to determine whether the award is supported by sufficient
evidence and order remittitur only if the award is so against the overwhelming
weight of the evidence as to be clearly wrong and manifestly unjust.  Golden Eagle Archery, Inc., 116 S.W.3d
at 771; Sw. Tex. Coors, Inc. v. Morales, 948 S.W.2d 948, 951 (Tex. App.BSan Antonio 1997, no writ).  If sufficient probative evidence exists
supporting the jury=s verdict, the reviewing court may not substitute
its judgment for that of the jury.  J.
Wigglesworth Co. v. Peeples, 985 S.W.2d 659, 666 (Tex. App.BFort Worth 1999, pet. denied).

When the jury is asked to award a single amount of
damages, but is told that it may consider various elements in arriving at that
amount, a challenge to the damages award must address all of the elements that
could have been considered by the jury in making its total, single-amount
award.  Golden Eagle Archery, Inc.,
116 S.W.3d at 771.  AIf there is just one element that is supported by
the evidence, the damages award will be affirmed if it is supported by the
evidence.@  Id.
(quoting Greater Houston Transp. Inc. v. Zrubeck, 850 S.W.2d 579, 589
(Tex. App.BCorpus Christi 1993, writ denied)).  








Based on our review, the evidence is sufficient to
support the jury=s award for waste. 
According to George Hite, there were $4,765,626 worth of reserves
remaining under the portion of the field that had not been leased by Emerald,
and, given the damage evident on the Emerald tract, it would be unlikely that
intervenors would be able to lease that property in the future.  He further testified that there were $535,000
in non-recoverable reserves under the portion of the field that had been leased
by Emerald.  The lost bonus payment
comprised $600,000.  We conclude the jury=s award was supported by sufficient evidence and the
award was not so against the overwhelming weight of the evidence as to be
clearly wrong and manifestly unjust. 
See Golden Eagle Archery, Inc., 116 S.W.3d at 771.  Accordingly, Exxon=s fifth issue is overruled in its entirety.

                                                           F.  Punitive Damages

In its sixth issue, Exxon argues that the trial
court erred in awarding the intervenors $10,000,000 in punitive damages on
their waste claim.  Exxon specifically
argues that (a) the trial court improperly overruled Exxon=s objection to a question which asked if Exxon acted
with malice, when that question failed to connect Exxon=s state of mind to the specific cause of action for
which the intervenors sought punitive damages, and (b) chapter 85 of the Texas
Nature Resources Code, by its absence of any language authorizing an award of
punitive damages, precludes the intervenors from recovering punitive damages on
their claim for statutory waste. 

                                                                 1.  The Charge








Exxon contends that the trial court erred by
submitting the Amalice@ question to the jury because it failed to connect
Exxon=s state of mind to the specific cause of action for
which the intervenors sought punitive damages.  
The standard of review for alleged jury charge error is abuse of
discretion.  Tex. Dep=t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Rosell v.
Cent. W. Motor Stages, Inc., 89 S.W.3d 643, 653 (Tex. App.BDallas 2002, pet. denied).  To determine whether alleged jury charge
error is reversible, we consider the parties=
pleadings, the evidence presented at trial, and the charge in its
entirety.  See Hyundai Motor Co. v.
Rodriguez, 995 S.W.2d 661, 663 (Tex. 1999). 
Error in the jury charge is reversible only if it probably caused the
rendition of an improper judgment or probably prevented the appellant from
properly presenting the case on appeal.  See
Tex. R. App. P. 44.1(a); Timberwalk
Apts. v. Cain, 972 S.W.2d 749, 756 (Tex. 1998).       

In order to analyze Exxon=s complaint, we must look at the structure of the
charge.  The first question submitted to
the jury inquired whether Exxon committed waste.  The second question, conditioned on an
affirmative finding of waste, asked if Exxon acted as a reasonably prudent
operator under the same or similar facts and circumstances.  The third question, conditioned on the jury=s finding that Exxon did not act as a reasonably
prudent operator, asked when the plaintiff-intervenors discovered or should
have discovered the waste.  The fourth
question, conditioned on the jury=s findings that Exxon committed waste and did not
act as a reasonably prudent operator, inquired about damages Aif any, that resulted from such conduct.@  The fifth
question, conditioned on the jury=s finding that Exxon did not act as a reasonably
prudent operator, asked if Exxon acted with malice.  The jury found that Exxon acted with
malice.  

Considering the court=s
charge as a whole, we conclude that the jury charge adequately connected the
malice question with the underlying tort of waste.  The question concerning malice was predicated
on findings concerning waste, and occurred sequentially in a cluster of
questions regarding waste.  See
Samedan Oil Corp. v. Intrastate Gas Gathering, Inc., 78 S.W.3d 425, 443-44
(Tex. App.BTyler 2001, pet. granted, jdgmt. vacated w.r.m.); Bradford
v. Vento, 997 S.W.2d 713, 730 (Tex. App.BCorpus
Christi 1999), rev=d on other grounds, 48 S.W.3d 749 (Tex. 2001). 
Accordingly, we reject Exxon=s argument that the trial court erred in its
submission of malice to the jury.

                                           2.  Punitive Damages for Statutory Waste








In attacking the award of punitive damages for
waste, Exxon further contends that plaintiff-intervenors are precluded from
recovering punitive damages for statutory waste.  According to Exxon=s argument, because chapter 85 of the Texas Nature
Resources Code does not expressly authorize the recovery of punitive damages,
punitive damages may not be awarded for a finding of statutory waste.  

As an initial matter, we note that the waste
question submitted to the jury combined statutory and common law waste.  Therefore, punitive damages may have been
predicated on a finding of common law waste. 
See Golden Eagle Archery, Inc., 116 S.W.3d at 771.  Moreover, we disagree with Exxon=s contention that the natural resources code does
not allow punitive damages for waste.








            Our goal in construing a statute is to
give effect to the Legislature=s intent as expressed in the language of the
statute.  See Horizon/CMS Healthcare
Corp., 34 S.W.3d at 892.  The plain
language of section 85.321 of the natural resources code allows a party to
recover Adamages and have any other relief to which he may be
entitled at law or in equity.@  See Tex. Nat. Res. Code Ann. ' 85.321. Based on the specific expansive language
used by the legislature in section 85.321, we conclude that the Legislature did
not intend to preclude punitive damages as a remedy for statutory waste.  See Horizon/CMS Healthcare Corp, 34
S.W.3d at 892 (discussing whether punitive damages can be awarded under statute
providing for Acivil 
liability for damages@).  Moreover,
this conclusion comports with analyses of other statutes that do not expressly
address the award of exemplary damages.  See,
e.g., Azar Nut Co. v. Caille, 734 S.W.2d 667, 668-69 (Tex. 1987)
(considering Adamages@ in retaliatory discharge statute to include
punitive damages); Castleberry v. Frost-Johnson Lumber Co., 283 S.W.
141, 142 (Tex. Comm=n App. 1926, judgm=t
adopted) (Adamages,@ unless limited, included exemplary damages under
workers compensation act).  Accordingly,
we overrule Exxon=s sixth issue.

                                     G.  Statute of Limitations for Breach of Contract

In its seventh issue, Exxon argues that the statute
of limitations bars intervenors from recovering on their breach of contract
claim when the intervenors filed suit against Exxon more than four years after
Exxon abandoned the Mary Ellen O=Connor Field. 
In its eighth issue, Exxon contends that the trial court erred in
allowing the intervenors to rely on fraudulent concealment to toll the running
of limitations.  In three subissues,
Exxon argues that:  (a) the evidence conclusively
shows that the intervenors knew or reasonably should have known of their cause
of action more than four years before they filed suit against Exxon; (b) the
trial court improperly instructed the jury, over Exxon=s objection, on the elements of fraud by
nondisclosure instead of the elements of fraudulent concealment; and (c) the
jury=s answer to question nine of the charge was
immaterial because the jury merely determined the date by which the intervenors
allegedly learned of the fraudulent concealment rather than the date by which
the intervenors reasonably should have known of their cause of action. 

                                                      1.  Fraudulent Concealment








Fraudulent concealment defers an action=s accrual period until the plaintiff learns of, or
should have discovered, Athe deceitful conduct or facts giving rise to the
cause of action.@  Earle v.
Ratliff, 998 S.W.2d 882, 888 (Tex. 1999). 
Fraudulent concealment is an equitable doctrine that provides a defense
to the bar of limitations.  Sauceda v.
Kerlin, 164 S.W.3d 892, 917 (Tex. App.BCorpus Christi 2005, pet. granted); Santanna
Natural Gas Corp. v. Hamon Operating Co., 954 S.W.2d 885, 890 (Tex. App.BAustin 1997, pet. denied). Under the doctrine of
fraudulent concealment, the accrual of the plaintiff's cause of action is
deferred because a defendant cannot be permitted to avoid liability for its
actions by deceitfully concealing wrongdoing until the statute of limitations
has run. Sauceda, 164 S.W.3d at 917. 
The essence of fraudulent concealment is (1) actual knowledge that a
wrong has occurred, and (2) a fixed purpose to conceal the facts necessary for
the plaintiff to know that the cause of action has accrued.  Id.; Arabian Shield Dev. Co. v.
Hunt, 808 S.W.2d 577, 584 (Tex. App.BDallas 1991, writ denied).

The elements of fraudulent concealment are:  (1) the existence of an underlying tort; (2)
the defendant's knowledge of the tort; (3) the defendant's use of deception to
conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.
 Sauceda, 164 S.W.3d at 917; Mitchell
Energy Corp. v. Bartlett, 958 S.W.2d 430, 439 (Tex. App.BFort Worth 1997, pet. denied); Arabian Shield
Dev. Co., 808 S.W.2d at 585.  To
establish the affirmative claim of fraudulent concealment, the plaintiff has
the burden of putting forth proof that raises an issue of fact with respect to
that claim.  Sauceda, 164 S.W.3d
at 917; Santanna Natural Gas Corp., 954 S.W.2d at 890.

Exxon contends that the evidence Aconclusively@ shows that intervenors knew or reasonably should
have known of their breach of contract claim more than four years before they
filed suit against Exxon.[6]   Exxon contends that intervenors were aware
of their contract claim when they initially filed suit for waste.








When reviewing the legal sufficiency of the
evidence, we view the evidence in the light most favorable to the verdict,
crediting favorable evidence if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  City of Keller v. Wilson, 168 S.W.3d
802, 807-08 (Tex. 2005). 

We conclude that the evidence supports the jury=s finding that Exxon fraudulently concealed its
failure to develop the property and that intervenors neither discovered, nor in
the exercise of reasonable diligence, should have discovered Exxon=s failure to develop until February 1999.  According to the trial testimony, intervenors
first learned that Exxon failed to develop two productive zones in 1999 when
Exxon first produced certain of its well logs for the field during discovery in
the instant lawsuit.  








Exxon representative Johnny Cortez testified that,
during negotiations with intervenors regarding the terms of the leases, he
refused to answer intervenors= questions about the field=s remaining reserves.  Despite having a contractual requirement to
provide intervenors with all information about its operations and the oil and
gas potentialities of the Mary Ellen O=Connor Field,[7]
Exxon provided intervenors with raw data about the field, but consciously and
deliberately chose not to provide intervenors with interpretive data on the
field.  According to Cortez, when Exxon
finally agreed to furnish documents to the intervenors in the form of a reading
room in 1990, Exxon did not tell the intervenors that they were not providing
them with the interpretive data on the field. 


Based on all the trial testimony, it is abundantly
clear that intervenors took an active and inquiring role regarding development
of their property and Exxon=s proposed abandonment of the lease.  The intervenors specifically queried Exxon
about future prospects for the field, remaining reserves, and future
development possibilities.    

Morgan Dunn O=Connor testified that her understanding was that the
reading room contained Aeverything@ that Exxon had pertaining to the lease.  T. Michael O=Connor
testified that while Exxon had initially refused to provide what it called Aproprietary@ information about the field=s potential, the reading room was to contain all
information about the lease.  The
intervenors retained an expert to examine the documentation in the reading room
to ascertain the prospects for the field.

George Hite testified that the reading room did not
include information about productive zones H12 and FS75, and that information
was not produced or available to intervenors until it was produced during
discovery in 1999.  Exxon=s employee, Joe Wylie, who performed a reservoir
analysis on the field, told the jury that his interpretive data on the field
was missing.  Wylie testified that it
would require analysis of well files for all 121 wells on the field in order to
determine which zones were productive. 
Exxon did not dispute that some of the well files were missing even at
the time of trial.  Interestingly, some
of the missing well files for the field were provided to Emerald=s representatives from Quintana, Exxon=s partner in production on an adjacent field.  








We reject Exxon=s contention that the evidence Aconclusively@ shows that intervenors were aware of the breach of
the development clause more than four years before they initially brought
suit.  Viewing the evidence in the light
most favorable to the verdict, crediting favorable evidence if reasonable
jurors could, and disregarding contrary evidence unless reasonable jurors could
not, based on Exxon=s own documentation, the field contained additional
productive zones which Exxon did not develop. 
See City of Keller, 168 S.W.3d at 807.  Exxon consciously withheld that documentation
from intervenors until the instant lawsuit was filed.

                                         2.  Jury Charge on Fraudulent Concealment

We next review Exxon=s
complaint about the charge.  Exxon contends
that the trial court improperly instructed the jury, over Exxon=s objection, on the elements of fraud by
nondisclosure instead of the elements of fraudulent concealment.

In the instant case, the jury was asked if Exxon
fraudulently concealed Aits failure to develop in accordance with the terms
of the Oil and Gas Leases@ from the intervenors, and was instructed that:

Fraudulent concealment occurs when B

 

1.                 
a party conceals or fails to disclose a material fact
within the knowledge of that party,

 

2.                 
the party knows that the other party is ignorant of the
fact and does not have an equal opportunity to discovery [sic] the truth,

 

3.                 
the party intends to induce the other party to take
some action by concealing or failing to disclose the fact, and

 

4.                 
the other party suffers injury as a result of acting
without knowledge of the undisclosed fact.

 

The jury found
that Exxon fraudulently concealed its failure to develop in accordance with the
terms of the oil and gas lease. 

At
trial, Exxon objected to the submission of this issue as follows:








Exxon
objects to the submission of Question No. 8, because the evidence conclusively
establishes that the Intervenors knew or should have known of the alleged
failure to develop claim more than four years before this cause of action was
brought.

 

Exxon
further objects to the submission of Question No. 8 because this theory of
recovery should not have been submitted, because the obligation is not as
Plaintiffs have defined it; and if given the proper instruction, the evidence B proper construction, forgive me, the
evidence conclusively establishes that Exxon fully developed the leases in
question.

 

Exxon
further objects to the submission of Question No. 8, because there is no evidence
that any material fact, as opposed to an opinion, has been concealed by Exxon
or Exxon has failed to disclose such to the Intervenors.

 

Exxon
does also request in connection with Question No. 8 an appropriate submission
defining fraudulent concealment.  It
objects that the definition given is a definition that is consistent with a
fraud cause of action as opposed to a fraudulent concealment cause of action,
and also requests that the Court tender the following instruction to the jury
in connection with Question No. 8 if it overrules Exxon=s
objections; that instruction being, fraudulent concealment ends when the party
learns of facts or circumstances that would cause a reasonable person either to
be aware of the existence of a cause of action or would cause a reasonable
person to make inquiry that would lead to the discovery of the cause of action
if pursued.

 

And
I would like the record to reflect that I=m
tendering that to the Court at this time.

 

I=m also tendering a correct instruction
defining fraudulent concealment; that being, fraudulent concealment occurs only
when a defendant has a duty to make disclosure and each of the following
elements are established: A, there exists an underlying wrong; B, the Defendant
has knowledge of the wrong; C, the Defendant concealed the wrong with the
intent to deceive the Plaintiff; and D, the Plaintiff reasonably relies on the
deception.

 

The
instruction, or requested instruction, also continues, a duty of disclosure
does not exist merely by the relationship between a royalty owner and an oil
and gas lessee.[8]

 








Exxon
relies on Advent Trust Co. v. Hyder, 12 S.W.3d 534 (Tex. App.BSan Antonio 1999, pet. denied), in
arguing that the trial court improperly instructed the jury, over Exxon=s objection, on the elements of fraud
by nondisclosure instead of the elements of fraudulent concealment.  In Advent, however, the jury question
asked whether the defendant committed fraud, not whether the defendant
fraudulently concealed its tort.  See
id. at 541-42.  The same cannot be
said in the instant case.  Because the
question adequately addresses the relevant issue, we cannot conclude that the
trial court abused its discretion.  See
Tex. Dep=t of
Human Servs., 802 S.W.2d at 649.








Moreover,
Exxon=s
requested definition is not substantially correct insofar as it fails to apprise
the jury that fraudulent concealment requires either the active
suppression of truth or the failure to disclose when there is a duty to speak.  See Tex.
R. Civ. P. 278; Placensio v. Allied Indus. Int=l, Inc., 724 S.W.2d 20, 21 (Tex.
1987).  The instruction also unduly
limits the duty to disclose, which can arise in several situations:  (1) when there is a fiduciary or confidential
relationship; (2) when one voluntarily discloses information, the whole truth
must be disclosed; (3) when one makes a representation, new information must be
disclosed if that new information makes the earlier representation misleading
or untrue; and (4) when one makes a partial disclosure and conveys a false
impression.  Hoggett v. Brown, 971
S.W.2d 472, 487 (Tex. App.BHouston
[14th Dist.] 1997, pet. denied). 
Moreover, the duty to disclose arises when one party knows that the
other party is ignorant of the true facts and does not have an equal
opportunity to discover the truth.  Miller
v. Kennedy & Minshew, Prof'l Corp., 142 S.W.3d 325, 345 (Tex. App.BFort Worth 2003, pet. denied).  And, ultimately, as a fundamental matter, we
conclude that, whether or not there was error in the charge, in considering the
parties' pleadings, the evidence presented at trial, and the charge in its
entirety, any such alleged error probably did not cause the rendition of an
improper judgment.  See Hyundai Motor
Co., 995 S.W.2d at 663.

                                                      3.  Materiality of Question Nine

Finally,
Exxon contends that the jury=s
answer to question nine is immaterial because the question asked when the
intervenors learned that Exxon fraudulently concealed its failure to develop
rather than asking when intervenors learned of their cause of action against
Exxon.  Question nine, predicated on an
affirmative answer to question eight, asked the jury: ABy
what date, if any, did Plaintiff-Intervenors know or, in the exercise of
reasonable diligence, should have known that Exxon fraudulently concealed its
failure to fully develop under the Oil and Gas leases?@  According to the jury=s
response, plaintiff-intervenors knew or should have known of the failure to
fully develop by February 1999.

In
discussing the relevant accrual date in fraudulent concealment cases, the Texas
Supreme Court has utilized language similar to that submitted to the jury in
the instant case.  Shah v. Moss,
67 S.W.3d 836, 841 (Tex. 2001) (fraudulent concealment tolls limitations until
the plaintiff discovers or could have discovered Athe
fraud@); Earle
v. Ratliff, 998 S.W.2d 882, 888 (Tex. 1999) (fraudulent concealment tolls
the running of limitations until such time as the plaintiff learned of, or
should have discovered, Athe
deceitful conduct or the facts giving rise to the cause of action@); KPMG Peat Marwick v. Harrison
County Hous. Fin. Corp., 988 S.W.2d 746, 750 (Tex. 1999) (limitations does
not begin to run until the claimant, using reasonable diligence, discovered or
should have discovered Athe
injury@);
Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 352 n.1 (Tex. 1990)
(defendant is estopped from relying on the defense of limitations until the
party learns of Athe right
of action@).  Accordingly we overrule this issue. 








                                                             H.  Breach of Contract

In
its ninth issue, Exxon argues that, Aas
a matter of law,@ it
complied with the unambiguous terms of its leases.  In its first subissue, Exxon argues that the
intervenors=
interpretation of the leases=
development clauses Aimproperly@ continued to impose a duty of
development on Exxon even after the leases terminated in 1990.  In a second subissue, Exxon further contends
that the intervenors=
interpretation of the leases ignores the legal effect of the habendum clauses,
which provide that the leases would remain in effect only for so long as Exxon
produced oil or gas in paying quantities. 
Finally, in its third subissue, Exxon contends that the intervenors= interpretation of the leases
improperly ignores the legal effect of the surrender clauses, which allowed
Exxon to surrender its rights back to the intervenors at any time.








In
construing an unambiguous oil and gas lease our task is to ascertain the
parties' intentions as expressed in the lease. 
Heritage Res. v. Nationsbank, 939 S.W.2d 118, 121 (Tex. 1996); Sun
Oil Co. v. Madeley, 626 S.W.2d 726, 727‑28 (Tex. 1981).  To achieve this goal, we examine the entire
document and consider each part with every other part so that the effect and
meaning of one part on any other part may be determined.  Heritage Res., 939 S.W.2d at 121; Steeger
v. Beard Drilling Co., 371 S.W.2d 684, 688 (Tex. 1963).  We presume that the parties to a contract
intend every clause to have some effect. Heritage Res., 939 S.W.2d at
121; Ogden v. Dickinson State Bank, 662 S.W.2d 330, 331 (Tex. 1983). We
give terms their plain, ordinary, and generally accepted meaning unless the
instrument shows that the parties used them in a technical or different sense. Heritage
Resources, 939 S.W.2d at 121; Western Reserve Life Ins. Co. v. Meadows,
152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953). 
We will enforce an unambiguous document as written.  Sun Oil Co., 626 S.W.2d at 728. 

Exxon=s argument under this issue and
subissues focuses not on the legal or factual sufficiency of the evidence  but on the relationship between three
contractual clauses in the leases: the development clauses, the habendum
clauses, and the surrender clauses.[9]

The
development clauses provide, in part, if a well were completed as a producer of
oil or gas in paying quantities, that Athe
lessee covenants and agrees to prosecute diligently a continuous drilling and
development program until said tract is fully developed for oil or gas.@ 
Under the leases, a tract is deemed to be fully developed when at least
one well has been drilled and completed in each horizon or stratum capable of
producing in paying quantities for each specified spacing protocol.

            A
lease's habendum clause defines the mineral estate's duration. Gulf Oil
Corp. v. Southland Royalty Co., 496 S.W.2d 547, 552 (Tex. 1973).  For instance, a typical habendum clause
states that the lease lasts for a relatively short fixed term of years (primary
term) and then "as long thereafter as oil, gas or other mineral is
produced" (secondary term).  See,
e.g., Reid, 337 S.W.2d at 269 n.1; see also 1 Smith & Weaver, Texas Law of Oil & Gas ' 4.3 (1996).  In Texas, a 
habendum clause requires actual production in paying quantities.  Reid, 337 S.W.2d at 269‑70; Garcia
v. King, 139 Tex. 578, 164 S.W.2d 509, 512 (Tex. 1942). The term Aproduction@
is substantially equivalent to Aproduction
in paying quantities@
even though the lease does not define production in those precise terms.  Clifton v. Koontz, 160 Tex. 82, 325
S.W.2d 684, 690 (1959). 








In
Texas, parties to an oil and gas lease may validly include a provision allowing
the lessee to surrender all or part of the lease.  Ridge Oil Co. v. Guinn Invs., Inc.,
148 S.W.3d 143, 152‑53 (Tex. 2004). 
The surrender clauses in the instant leases provide:

Lessee may at any
time surrender and relinquish any part or portion of the lands covered by this
lease . . . by executing and delivering to lessor a legally sufficient
instrument of release . . . .  Such
release shall, upon the date of its delivery, terminate this lease as to the
lands and sands therein released, but the lessee shall not thereby in any way
be relieved or released of any past due charges or of performing any
obligations which may have accrued under this lease prior to time of delivery
of such release . . . . Neither can lessee by such release to lessor relieve
themselves of all of the obligations assumed by lessee in Article 3 [the development
clause] of this lease.

 

Exxon
contends that, as a matter of law, it did not breach the unambiguous terms of
its leases.  According to Exxon, the
intervenors contend that Exxon should have recompleted some of its wells in
commercially productive zones even after Exxon could no longer profitably
produce any oil and gas from the field, and this interpretation of the lease
ignores the legal effect of the habendum and surrender clauses.  Exxon points to the testimony of its
reservoir engineer, Joel Wylie, who testified that Exxon could no longer
produce oil or gas profitably from the field by the summer of 1990.  

We
disagree with Exxon=s
contentions.  As a fundamental matter,
Exxon=s
contentions fail to account for and harmonize the surrender clauses, which
expressly prohibit surrender of the leases unless the tracts have been fully
developed.  According to Exxon, it had
the right to surrender any area whether there was a producing well on it or not
and regardless of the capacity of any well that might be on it.  See Rhoads Drilling Co. v. Allred, 123
Tex. 229, 70 S.W.2d 576, 585 (Tex. 1934). 
However, the surrender clauses at issue in this case are made expressly
subject to the development obligation, and we harmonize these provisions and
give effect to both.  See MCI
Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999).









According
to the testimony at trial, the tracts had not been fully developed for all
productive zones.  Moreover, while Exxon
contends that the lease was no longer capable of producing in paying
quantities, this issue was a matter that was hotly disputed at trial.  Hite testified that the leases were capable
of producing in paying quantities until 1999. 
Testimony further indicates that Exxon did not drill and complete wells
in two productive horizons, H12 and FS75.

Although
the habendum clause generally controls the mineral estate's duration, other clauses
may extend the habendum clause's term. Anadarko Petroleum Corp. v. Thompson,
94 S.W.3d 550, 554 (Tex. 2002); Southland Royalty, 496 S.W.2d at 552.
When a lease terminates Ais
always a question of resolving the intention of the parties from the entire
instrument.@  Anadarko Petroleum Corp., 94 S.W.3d at
554; Southland Royalty, 496 S.W.2d at 552.  Based on the leases as a whole, we conclude
that the habendum and surrender clauses here were controlled by the development
requirement, which Exxon failed to meet. 
Therefore, we overrule Exxon=s
ninth issue and subissues.

                                                               I.  Double Recovery

In
its final two issues, Exxon argues that the trial court=s
judgment improperly awards the intervenors a double recovery.  First, in issue number ten, Exxon argues that
questions four and ten of the court=s
charge violate the single satisfaction rule by allowing the intervenors to
recover twice for the alleged loss of the same reserves.  In its eleventh and final issue, Exxon argues
that the trial court=s
award of $18,600,000 amounts to an impermissible double recovery for the
intervenors.








A
party is generally entitled to sue and to seek damages on alternative
theories.  Waite Hill Servs., Inc. v.
World Class Metal Works, Inc., 959 S.W.2d 182, 184 (Tex. 1998).  A party is not, however, entitled to a double
recovery, which exists when a plaintiff obtains more than one recovery for the
same injury.  See id.  Under the one satisfaction rule, a
plaintiff is entitled to only one recovery for any damages suffered. Crown
Life Ins. Co. v. Casteel, 22 S.W.3d 378, 390 (Tex. 2000); Stewart Title
Guar. Co. v. Sterling, 822 S.W.2d 1, 7 (Tex. 1991); see Bradshaw v.
Baylor Univ., 126 Tex. 99, 84 S.W.2d 703, 705 (1935). This rule applies
when multiple defendants commit the same act as well as when defendants commit
technically different acts that result in a single injury.  Crown Life Ins. Co., 22 S.W.3d at 390.
Thus, notwithstanding an alternative theory of liability, a double recovery
will result if multiple damage awards are the result of one injury.  Birchfield v. Texarkana Mem'l Hosp., 747
S.W.2d 361, 367 (Tex. 1987).  When the
prevailing party fails to elect between alternative measures of damages, the
court should render the judgment affording the greatest recovery.  Parkway Co. v. Woodruff, 901 S.W.2d
434, 441 (Tex. 1995).








Exxon
contends that the damage awards for waste in question four and breach of
contract in question ten are duplicative. The jury awarded $5,000,000 for
waste, considering as elements of damages the cost to drill new wells, the
value of the minerals that could not be recovered, and the loss of bonus
payments.  With regard to the breach of
contract claim, in question ten the jury found that Exxon failed to comply with
the contractual requirement that A.
. . Lessee covenants and agrees to prosecute diligently a continuous drilling
and development program until said tract is fully developed for oil and gas.@ 
The jury awarded $3,600,000 as the amount, Ain
reasonable probability, the Plaintiff-Intervenors would have received for the
minerals produced had Exxon fully developed the Oil and Gas Leases less the
costs of operation and production and any royalty received from Emerald Oil
& Gas L.C.@

Exxon
argues that these damage awards overlap because they award damages for the same
reserves, that is, those minerals which Exxon failed to produce before plugging
its wells and those which remained in the ground after Emerald unsuccessfully
tried to reenter the wells.  

When
a plaintiff pleads alternate theories of liability, judgment awarding damages
on more than one theory may stand if the theories of liability arise from
separate and distinct injuries and separate and distinct damage findings are
entered on each theory of liability. See Birchfield, 747 S.W.2d at 367; Baribeau
v. Gustafson, 107 S.W.3d 52, 60 (Tex. App.BSan
Antonio 2003, pet. denied). 

Cases
holding that a judgment based on both alternate grounds of recovery is an
impermissible double recovery involve situations in which there is only one
injury, the theories of liability are mutually exclusive, or there are not
separate damage findings based on the alternate theories of liability.  Borden, Inc. v. Guerra, 860 S.W.2d
515, 528‑29 (Tex. App.BCorpus
Christi 1993, writ dism=d);
see Southern Cty. Mut. v. First Bank & Trust, 750 S.W.2d 170 (Tex.
1988); Birchfield, 747 S.W.2d at 367; Auto Ins. Co. of Hartford v.
Davila, 805 S.W.2d 897, 902 (Tex. App.BCorpus
Christi 1991, no writ). 

In
the instant case, the intervenors=
damages were separate and distinct, that is (1) damages for the failure to
develop under the leases, and (2) damages for the destruction of the wellbores
and the consequent loss of reserves.  The
theories of breach of contract and waste are not mutually exclusive.  We conclude that the jury properly awarded
separate and distinct damage awards based on each theory.  We overrule this issue. 








Having
overruled all of Exxon=s
issues on appeal, the judgment against Exxon and in favor of the intervenors is
affirmed.

                                                            III.  Intervenors=
Appeal

Intervenors
request that this Court affirm the trial court=s
judgment awarding damages for waste and breach of contract; however, if this
Court Atakes any
other action on this appeal,@
intervenors request that we reverse the trial court=s
order granting a directed verdict against intervenors and remand for trial
intervenors= claims
against Exxon for (1) tortious interference with economic opportunity, (2)
negligence and gross negligence, (3) negligence per se, (4) fraud and negligent
misrepresentation, and (5) breach of regulatory duty.  

Because
we affirm the trial court=s
judgment in favor of intervenors, we need not reach these additional
issues.  See Tex. R. App. P. 47.1.  

                                                             IV.  Emerald=s
Appeal

Emerald
appeals the trial court=s
granting of a directed verdict on its remaining common-law causes of
action.  In three issues, Emerald argues
that the trial court erred in granting Exxon=s
motion for a directed verdict on Emerald=s
causes of action for fraud, negligent misrepresentation, and tortious
interference with economic opportunity.  








A
directed verdict is proper when:  (1) a
defect in the opponent=s
pleading makes the pleading insufficient to support a judgment; (2) the
evidence conclusively proves a fact that establishes a party=s right to judgment as a matter of law;
or (3) the evidence offered on a cause of action is insufficient to raise an
issue of fact.  Encina P=ship v. CORENERGY, L.L.C., 50
S.W.3d 66, 68 (Tex. App.BCorpus
Christi 2001, pet. denied).  In reviewing
a directed verdict, we examine the evidence in the light most favorable to the
party suffering the adverse judgment and we decide whether there is any
evidence of probative value to raise an issue of material fact on the question
presented.  Bostrom Seating, Inc. v.
Crane Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004).

                                                                       A.  Fraud

To
prevail on its claim for fraud, Emerald must prove that:  (1) Exxon made a material representation that
was false; (2) it knew the representation was false or made it recklessly as a
positive assertion without any knowledge of its truth; (3) it intended to
induce Emerald to act upon the representation; and (4) Emerald actually and
justifiably relied upon the representation and thereby suffered injury.  Ernst & Young, L.L.P. v. Pac. Mut.
Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001). 

One
who makes a fraudulent misrepresentation is liable to the persons or class of
persons whom he intends, or has reason to expect, to act in reliance upon the
misrepresentation for pecuniary loss suffered by them through their justifiable
reliance, in the type of transaction in which he intends or has reason to
expect their conduct to be influenced.  Id.
at 578.  Even an obvious risk that a
misrepresentation might be repeated to a third party is not enough to satisfy
the reason‑to‑expect standard; rather, the alleged fraudfeasor must
have information that would lead a reasonable person to conclude that there is Aan especial likelihood that it will
reach those persons and will influence their conduct.@  Id. at 580.  Further, mere foreseeability will not meet
the reason‑to‑expect standard; instead, the claimant's reliance
must be Aespecially
likely@ and
justifiable, and the transaction sued upon must be of the type contemplated by
the defendant.  Id.








Emerald
argues that the trial court erred in directing a verdict on its cause of action
for fraud because there is evidence that Exxon intended that Emerald rely on
Exxon=s
representations in the public filings with the Railroad Commission.  Exxon responds that it could not have
intended to induce Emerald to act in reliance on Exxon=s
filings at the Commission when Emerald did not exist at the time those filings
were made.  Exxon also argues that
evidence that Exxon should have known that remote subsequent operators might
rely on representations in its Commission filings does not satisfy the intent
requirement for a viable fraud cause of action. 
Exxon finally argues that there was no evidence that Exxon actually knew
that a class of remote subsequent operators might rely on representations
contained in Exxon=s
Commission filings.

We
disagree with Exxon=s
contentions.  Examining the evidence at
trial in the light most favorable to Emerald, we believe that there is some
evidence of probative value sufficient to raise an issue of material fact on
Emerald=s fraud
claim.  Bostrom Seating, Inc., 140
S.W.3d at 684.  Exxon made material
misrepresentations on its W-3 reports regarding many of the wells at issue in
this proceeding.  There was substantial
testimony from the trial witnesses, including Exxon=s
own witnesses, that Exxon knew subsequent lessees and operators would rely on
such filings to make business decisions regarding the wells.  Exxon also knew that Emerald=s predecessor was interested in leasing
the property.  We conclude that the
foregoing is adequate evidence to satisfy the element of intent.  See Spoljaric v. Percival Tours, Inc.,
708 S.W.2d 432, 435 (Tex. 1986) (circumstantial evidence of fraud may also be
used to support a finding of fraudulent intent).  Emerald leased the property, relying on Exxon=s public filings with the Railroad
Commission, to its financial detriment. 
Accordingly we sustain Emerald=s
first issue. 

                                                      B.  Negligent Misrepresentation








To
prevail on a claim for negligent misrepresentation, a plaintiff must
demonstrate four elements: (1) the defendant made a representation in the
course of his business or in a transaction in which the defendant has a
pecuniary interest; (2) the defendant supplied false information for the
guidance of others in their business; (3) the defendant did not exercise
reasonable care or competence in obtaining or communicating the information;
and (4) the plaintiff suffered pecuniary loss by justifiably relying on the
defendant=s
representation.  Fed. Land Bank Ass=n of Tyler v. Sloane, 825 S.W.2d
439, 442 (Tex. 1991); Allied Vista, Inc. v. Holt, 987 S.W.2d 138, 141
(Tex. App.BHouston
[14th Dist.] 1999, pet. denied).

Exxon
argues that the statute of limitations bars Emerald=s
causes of action for negligent misrepresentation because the evidence
conclusively establishes that Emerald knew of its alleged injury more than two
years before it filed suit against Exxon. 
However, we have already determined that the discovery rule applies,
and, viewing the evidence in the light most favorable to Emerald, there is
probative evidence that Emerald did not discover Exxon=s
tortious conduct until January 1995 when Lynch received Exxon documents from
Quintana Petroleum, Exxon=s
partner in another lease.  Because
Emerald filed suit less than two years after receiving these documents, the
statute of limitations was not violated. 









Exxon
also contends that there is no evidence that Exxon made the representations in
its Form W-3s for the purpose of guiding Emerald in the conduct of its
business.  Liability under section 552 is
limited to those providers of information who (1) intend to supply the
information to, or know the recipient of the information intends to supply the
information to, a particular person or limited group, and (2) intends the person
or limited group to rely on the information, or knows the person or limited
group intends to rely on the information, for a particular or substantially
similar transaction.  Restatement (Second) of Torts ' 552(2) (1977); McCamish, Martin,
Brown & Loeffler v. F.E. Appling Interests, 991 S.W.2d 787, 794 (Tex.
1999).

In
the instant case, as previously discussed, it was virtually undisputed that
operators routinely and as a matter of course rely on the public filings with
the Railroad Commission in making decisions regarding operations.  Exxon knew this.  Exxon thus supplied information to a limited
group and anticipated that it would be relied upon by that group.  Id. 
Accordingly, we sustain Emerald=s
second issue.

                                      C.  Tortious Interference with Economic
Opportunity

In
its third issue, Emerald argues that Exxon was not entitled to a directed
verdict on Emerald=s cause
of action for tortious interference with contract or economic opportunity.  In reply, Exxon argues that there is no
evidence that it interfered with an existing contract or with Emerald=s prospective business or contractual
relations.  Finally, Exxon argues that
Emerald=s claims
for tortious interference with economic opportunity is barred by the statute of
limitations.[10]  As an initial matter, we note that we have
already resolved the issue of limitations against Exxon and need not further discuss
it herein.  








Exxon
correctly contends that tortious interference with contract requires an
existing contract.  The elements of
tortious interference with an existing contract are:  (1) an existing contract subject to
interference; (2) a willful and intentional act of interference with the
contract; (3) that proximately caused the plaintiff's injury; and (4) caused
actual damages or loss. Prudential Ins. Co. of Am. v. Fin. Review Servs.,
Inc., 29 S.W.3d 74, 77 (Tex. 2000).  

As
determined by the pleadings, however, Emerald did not contend that Exxon
interfered with an existing contract. 
Emerald=s live
pleading includes a section entitled Atortious
interference with economic opportunity.@  The text of this section states that Exxon=s acts constituted intentional sabotage
of the wells and the acts were calculated to cause damage to Emerald or any
subsequent lessee who sought to develop or redevelop the field.  The text concludes, in part, that Exxon=s actions made Emerald=s performance under its lease Amore burdensome, difficult or
impossible or of a less or no value . . . .@  

Texas
law protects existing as well as prospective contracts from interference.  Sterner v. Marathon Oil Co., 767 S.W.2d
686, 689 (Tex. 1989).  The tort of
interference with contracts embraces all intentional invasions of contractual
relations, including any act interfering with the performance of a contract,
regardless of whether breach of contract is induced.  Samedan Oil Corp. v. Intrastate Gas
Gathering, 78 S.W.3d 425, 446 (Tex. App.BTyler
2001, pet. dism=d by
agr.); Tippett v. Hart, 497 S.W.2d 606, 611 (Tex. Civ. App.BAmarillo 1973, writ ref'd n.r.e.).  It follows that where the intentional acts of
a person serve to frustrate the purpose of another's contract with a third
party, thereby causing damage, such acts constitute the requisite interference.
Samedan Oil Corp., 78 S.W.3d at 447; Hughes v. Houston Nw. Med. Ctr.,
680 S.W.2d 838, 842 (Tex. App.BHouston
[1st Dist.] 1984, writ ref'd n.r.e.). 
Interference includes any act which retards, makes more difficult, or
prevents performance.  Seelbach v.
Clubb, 7 S.W.3d 749, 757 (Tex. App.BTexarkana
1999, pet. denied).








As
early as July 1989, Exxon knew that Pace Production Company, a predecessor of
Emerald, was interested in leasing the property in question.  Exxon=s
conduct in filing false Form W-3 plugging reports and in effectively sabotaging
the wells to prevent or hamper reentry interfered with Emerald=s performance under its lease with the
intervenors.  Emerald sustained costs far
in excess of those that would have been reasonable and necessary costs for the
redevelopment of the Mary Ellen O=Connor
Field.  Examining the evidence in the
light most favorable to Emerald, we conclude that there is evidence of
probative value raising an issue of material fact on the question
presented.  Bostrom Seating, Inc.,
140 S.W.3d at 684.  We sustain Emerald=s third issue.  

Having
sustained Emerald=s issues,
we reverse the trial court=s
order granting a directed verdict on Emerald=s
causes of action for fraud, negligent misrepresentation, and tortious
interference, and remand those issues for the jury's determination.

                                                                   V.
 Conclusion

The
judgment of the trial court is affirmed in part and reversed and remanded in
part.  Having overruled Exxon=s issues on appeal, we affirm the
judgment of the trial court in favor of the royalty interest owners.  We sustain Emerald=s
issues on appeal and reverse and remand its causes of action to the trial
court.  

 

                                           

Rogelio Valdez,

Chief Justice

 

 

Opinion delivered and filed

this 29th day of November, 2005.











[1] The royalty interest owners are Laurie T. Miesch, Molly Miesch Allen,
Michael Miesch, Jack Miesch, Janie Miesch Robertson, Morgan Frances Dunn O=Connor, Brien O=Connor Dunn, Kelly Patricia Dunn
Schaar, Bridey Kathleen Dunn Greeson, T. Michael O=Connor and Nancy O=Connor.





[2] Prior to trial, the trial court granted Exxon's motion for summary judgment
on Emerald's statutory causes of action and severed the summary judgment.  Emerald appealed the summary judgment.  This Court reversed the trial court=s judgment and remanded the case to
the trial court for further proceedings consistent with the Court=s opinion.  See Emerald Oil and Gas, L.C. v. Exxon
Corp., No. 13-99-757-CV, 2005 Tex. App. LEXIS 591, *16 (Tex. App.BCorpus Christi Jan. 27, 2005, pet.
filed). 






[3] The leases are substantially similar. 
Any relevant distinctions between the leases will be discussed herein as
necessary.





[4] Exxon plugged the wells at the field by cutting, but not pulling or
removing, the well casing.  According to
testimony at trial, the standard plugging procedure was to perforate casing and
leave it in place, rather than cutting it, during plugging.  If casing were to be cut during the plugging
process, it would ordinarily be pulled from the wellbore.  Cut casing, as opposed to perforated casing,
was a continuing impediment to reentry because of its propensity to shift in
the wellbore and the high probability of future loss of the wellbore or a portion
of the well.





[5] Question one asked:

 

Did Exxon commit waste on property
or production in which the Plaintiff‑Intervenors own an interest?

 

"Waste" means, among
other things, B

 

a.         underground
waste or loss, however caused; or

 

b.         physical waste or loss incident to or
resulting from drilling, equipping, locating, spacing, or operating a well or
wells in a manner that reduces or tends to reduce the total ultimate recovery
or oil or gas from any pool; or

 

c.         surface or subsurface waste of
hydrocarbons, including the physical or economic waste or loss of hydrocarbons;
or

 

d.         whatever dictates of reason, fairness,
and good judgment under all the facts would lead one to conclude is wasteful.

 

Subsections a, b, and c closely
track the statutory language of section 85.045 subsections 3, 6, and 11.  Tex.
Nat. Res. Code Ann. ' 85.045(3), (6), (11). 
Subsection d follows the common law rule of waste as dictated by the
Texas Supreme Court in R.R. Comm=n v. Shell Oil Co., 206 S.W.2d 235 (Tex. 1947); see R.R. Comm=n v. Rowan Oil Co., 152 Tex. 439, 259 S.W.2d 173
(1953).





[6] We note that Exxon=s contention herein drastically differs from its position
when it filed a motion for continuance of the trial based on intervenors= amended petition including the
breach of development claim.  At that time,
Exxon stated that the Apredominant theory of the case
appears to have changed substantially.@  According to Exxon=s motion, the case had been based
on AExxon=s alleged improper plugging of the
wells . . . and alleged waste of the hydrocarbons@ on the leases, but the amended
petition raised Exxon=s Aalleged failure to develop those
leases before it surrendered them in 1991.@





[7] The leases provide:  ALessor shall at all times be
entitled to full information covering all of lessee=s operations on the leased premises
or otherwise pertinent to lessor=s interests.  To this
end, lessor, through her representative or representatives duly designated from
time to time in writing, shall have free access to all operations conducted by
lessee upon the leased premises and, at all reasonable times, to all of lessee=s records and data pertaining
thereto.  Further, lessee shall furnish
lessor, or lessor=s duly accredited agent, copies of
all logs, geological and geophysical reports, core analyses and all other such
data and information available to lessee pertaining to the leased premises,
their oil and gas potentialities and the investigating, exploration,
development and producing operations conducted thereon by lessee, and all such
instruments and information and data shall become the property of lessor.@ 





[8] On appeal, Exxon argues that the submitted question omits the element
of reliance; however, Exxon did not raise this objection at trial and
accordingly we will not consider it on appeal. 
See Tex. R. App. P.
33.1.





[9] The four leases are not identical; however, the differences do not
affect the analysis herein.





[10] On appeal, Exxon argues that Texas law does not recognize a cause of
action for interference with economic opportunity separate and apart from
causes of action for tortious interference with an existing contract or with
known prospective business or contractual relations.  Exxon did not raise this issue in its motion
for directed verdict and did not reference it in argument to the trial
court.  Accordingly, we need not consider
it here. 
Tex. R. App. P. 33.1.